579 A.2d 797

**LEATHERWOOD MOTOR COACH TOURS CORPORATION, et al.**

v.

**Sonya C. NATHAN.**

No. 1763, Sept. Term, 1989.

Court of Special Appeals of Maryland.

Sept. 27, 1990.

Jacob J. Cecere (Frank J. Coviello and Gilberg & Kurent, on the brief) Rockville, and Washington, D.C., for appellant, Leatherwood.

Gerard J. Stief (Colin M. Dunham, Richard H. McBurrows, Robert J. Kniaz and Robert L. Polk, on the brief, Washington, D.C., for appellant, Washington Metropolitan Area Transit Authority.

William Connelly (Philip C. Sessoms, on the brief) Camp Springs, for appellee.

Argued before ALPERT, BLOOM and CATHELL, JJ.

BLOOM, Judge.

Appellee, Sonya C. Nathan, fell and sustained bodily injuries while she was attempting to board a bus owned by appellant Leatherwood Motor Coach Tours Corp. (Leatherwood) at a bus stop established by appellant Washington Metropolitan Area Transit Authority (WMATA) along a State highway. Ms. Nathan's suit in the Circuit Court for Prince George's County against Leatherwood, WMATA, and the State Highway Administration (SHA) resulted in a jury verdict for $25,000 against all three defendants. The court thereafter granted SHA's motion for judgment *n.o.v.* but denied similar motions filed by Leatherwood and WMATA, who now bring this appeal.

Since appellee's recovery against appellant Leatherwood appears to have been based on a different theory than that supporting her recovery against WMATA, appellants do not raise identical issues. Leatherwood contends:

1.  Plaintiff was not a passenger of Leatherwood at the time of the accident and was not entitled to an instruction on the heightened degree of care required in a passenger/carrier relationship.

2.  Assuming *arguendo* that a passenger/carrier relationship existed between Leatherwood and the plaintiff, Leatherwood had no duty to maintain the public bus stop area which was not under its ownership or control and, therefore, the trial court should have directed a verdict in Leatherwood's favor since no breach of duty could be found.

3.  The trial court abused its discretion in allowing the case to go to the jury where there was insufficient evidence of notice of a dangerous condition which could be attributed to Leatherwood.

4.  The trial court erred in failing to direct a verdict in Leatherwood's favor because plaintiff had assumed the risk of her injuries.

5. The trial court erred in not directing a verdict for Leatherwood because plaintiff was contributorily negligent as a matter of law.

WMATA, in turn, asserts:

1. The trial court erred in denying WMATA's motions for summary judgment, directed verdict, and judgment *n.o.v.* because no duty of care extends to a prospective passenger of another carrier on land not owned or controlled by WMATA.

   A. WMATA has no liability as a common carrier where Nathan was not a WMATA bus passenger.

   B. WMATA has no duty as a landowner because it neither owns nor controls the ground around the bus stop signs.

2. Assuming *arguendo* that WMATA had a duty to maintain the bus stop area, Nathan failed to present sufficient evidence to show that WMATA was negligent.

3. Assuming *arguendo* that WMATA had a duty in regard to maintenance of the shoulder, this duty cannot exceed that of the Highway Administration.

4. Nathan was contributorily negligent and assumed the risk as a matter of law since she knew of the bus stop conditions and failed to take adequate precautions.

We believe the issues can be greatly simplified. The principal issue in the case is whether either of the appellants breached any duty owed by it to appellee. The only basis for her claim being that she fell because the gravel surface made the bus stop an unsafe place to take on passengers, that issue can be restated: did the allegedly hazardous condition of the gravel surface at the bus stop involve any breach of duty by either or both appellants? One theory upon which appellee's claim was based is that Leatherwood, because of its status as a common carrier, was obliged to exercise the highest degree of care for appellee's safety and breached it by providing an unsafe place for her to board its bus. Indeed, the court, over

objection, instructed the jury as to the standard of care owed by a common carrier. The theory of liability as to WMATA was based upon appellee's claimed status of business invitee, which, she asserted, imposed a duty with respect to the safety of the premises. We shall reverse the judgment of the circuit court, holding that the court erred in denying appellants' motions for judgment at the conclusion of the trial and also for judgment *n.o.v.* because there is no evidence of negligence, *i.e.*, breach of duty owed by either appellant to appellee. It will not be necessary, therefore, for us to address the contentions that, as a matter of law, appellee was contributorily negligent and assumed the risk of her own injuries.

## *Facts*

The injury to appellee occurred on Pennsylvania Avenue, near Donnell Drive and the Penn Mar Shopping Center in Forestville, Maryland. At that site, Pennsylvania Avenue is a macadam-surfaced highway with a narrow dirt and gravel shoulder, on which WMATA, with SHA approval, had erected a bus stop sign on a pole.

Appellee was a regular bus commuter from Forestville to her place of employment in Washington, D.C., and was quite familiar with the terrain and the gravel surface of the shoulder. Leatherwood buses, as well as WMATA Metro buses to Washington, stopped at that site to receive and discharge passengers. There was another WMATA bus stop across the street, and Leatherwood buses stopped at a location about three quarters of a mile away.

Appellee preferred to commute on the Leatherwood bus rather than the WMATA Metro bus because the former made fewer stops. In fact, she had used the Leatherwood bus to commute to work at least three or four times a week for a couple of months prior to the time she was injured.

On 7 July 1983, appellee, along with several other people, waited at the bus stop. The Leatherwood bus stopped on the paved surface of the highway, near the shoulder. Six

people boarded the bus safely and without incident before appellee attempted to board. As she grasped the handrail, she slipped on the gravel underfoot and fell, her face striking the step on the bus. Appellee, who weighed about 170 pounds at the time, was wearing shoes with high heels. Although she characterized the heels as "medium," she also estimated their height at between two and one-half and three inches. She had previously experienced difficulty walking on the gravel surface while wearing those shoes.

## I

The scope of the duty owed by a common carrier to one of its passengers is well established. "A common carrier is not an insurer of the safety of its passengers, but is bound to employ the highest degree of care for their safety consistent with the nature of the undertaking." *Mass Transit Adm. v. Miller*, 271 Md. 256, 259, 315 A.2d 772 (1974).

Appellee's injuries were sustained before she had actually boarded the bus, and were attributable to the condition of the surface of the shoulder of the road at the place of boarding, rather than to any defect in the bus itself or any act by the driver after he stopped to permit passengers to board. The question, therefore, is: when did the relationship of carrier and passenger, with its attendant requirement of a heightened degree of care, arise?

With respect to that issue, the court instructed the jury:

A common carrier is someone who holds himself out to the public as offering to transport for hire persons which are brought to it as long as it has available space and there is no legal excuse for refusing to transport such persons. A passenger is one who travels in a bus as a result of the contract with the carrier.

A person becomes a passenger when, with the implied consent of the carrier, the person enters upon the bus, but actual entry upon the bus is not necessary to create a relationship of carrier and passenger in which one may

become a passenger. A common carrier of passengers, while not as an insurer of the safety of passengers, must employ the utmost care and diligence which human foresight can use. It is required to use the utmost degree of care, skill, and diligence in everything that concerns its passengers' transportation but is extended further and requires the carrier to provide a safe means to enter and exit the bus.

This instruction, to which appellants duly excepted, appears to have been taken from the Maryland Pattern Jury Instructions, which emphasize that the duty of the carrier to the passenger extends beyond the carriage itself, to its station, platform, waiting room, or other areas provided by it for its passengers.

The pattern instruction with respect to when the passenger status begins is based upon several Maryland cases which hold that the relationship between carrier and passenger is not confined to the duration of the trip. The heightened duty of care owed by the carrier was held to apply to a passenger who, after paying his fare, was injured by an unruly crowd while attempting to board a car at a prepayment station maintained by the carrier. *Dilley v. Baltimore Transit Co.*, 183 Md. 557, 39 A.2d 469 (1944). In *Philadelphia, Baltimore and Washington Railroad Co. v. Green*, 110 Md. 32, 71 A. 986 (1909), one who was waiting at the railroad station for a train he intended to board when he was assaulted by an agent of the carrier was held to be a passenger at the time of the tort. On the other hand, one who got to the station after his train had left and was injured while attempting to board a moving train not in passenger service was not a passenger. *Damico v. Washington, Baltimore and Annapolis Electric Railroad Co.*, 158 Md. 470, 148 A. 821 (1930). Once the status of passenger has begun, it continues until the journey is completed and the passenger is safely discharged. Thus, when a taxi cab door closed on the coat of an alighting passenger and the driver put the cab in motion, it was held that the

relationship of carrier and passenger was still in effect. *Jacobson v. Julian*, 246 Md. 549, 229 A.2d 108 (1967).

The cases cited above in which a carrier has been held to the degree of care due to a passenger or prospective passenger who has not yet boarded the conveyance have all involved injuries occurring on premises owned, controlled, or maintained by the carrier. It is not unreasonable to say that the relationship of carrier and passenger begins when one, having paid a fare to be transported from one place to another or, with the intention to do so, enters a station or upon a platform or other premises maintained by the carrier as a place for passengers to wait until they board the conveyance. We are aware of no Maryland case, however, holding that a common carrier owes such a heightened degree of care to a prospective passenger on property not owned, controlled, or maintained by the carrier. Indeed, Maryland case law suggests to the contrary.

In *Adams v. Baltimore Transit Co.*, 203 Md. 295, 100 A.2d 781 (1954), the plaintiff, a passenger of the Baltimore Transit Company, sustained injuries after he left the transit company streetcar at a waiting station jointly maintained by the transit company and the Baltimore and Ohio Railroad Company on a strip of land owned by the railroad company. Maintenance of the station was for the convenience of transit company passengers who worked at Maryland Drydock. To get from the waiting station to his place of work, the plaintiff had to traverse Sun Street, a public way, across which the railroad tracks ran. The railroad company habitually parked its cars blocking Sun Street and Drydock's employees used to crawl under or climb over the coupling between railroad cars in order to get to work. Plaintiff was in the process of performing such a maneuver when the train was suddenly, unexpectedly, and without warning started in motion. The plaintiff, having settled with the railroad company, attempted to recover from the Transit Company and the City of Baltimore. The theory of the case against the Transit Company was that it violated the heightened standard of duty it owed to its passenger when it left

him off at an unsafe place. The court held that there was nothing unsafe about the facility maintained by the Transit Company where plaintiff left the streetcar, and the Transit Company's obligation to the plaintiff ceased when it left him off there. The Court distinguished the case before it from *Topp v. United Railways Co.*, 99 Md. 630, 59 A. 52 (1904), in which a suburban electric railway company was held liable for discharging a passenger in an unsafe place on its own premises. In *Adams*, the unsafe place was on the railroad company's premises, over which the Transit Company had no control.

The *Adams* Court cited, with approval, cases from other jurisdictions holding that common carriers have no responsibility for traffic and other hazards on public streets or defects on premises over which the carrier has no control. *Terre Haute Indianapolis & Eastern Traction Co. v. Auler*, 206 Ind. 423, 188 N.E. 572 (1934); *Quimby v. Boston & Maine R. Co.*, 69 Me. 340 (1879); *Baier v. Cleveland Ry. Co.*, 132 Ohio St. 388, 8 N.E.2d 1 (1937); *Hempton v. Green Bay & W. Ry. Co.*, 162 Wis. 62, 155 N.W. 927 (1916); *Smith v. N.O. Ry. & Light Co.*, 150 La. 1070, 91 So. 514 (1922); *Cooke v. Elk Coach Line, Inc.*, 37 Del. 120, 180 A. 782 (1935); *Creamer v. West End St. Ry. Co.*, 156 Mass. 320, 31 N.E. 391 (1892); *St. John v. Connecticut Co.*, 103 Conn. 641, 131 A. 396 (1925). Such cases, the Court found, were distinguishable from those imposing liability on the carrier for discharging a passenger at an unsafe place on its own premises, or if the only means of egress from the carrier's premises are unsafe, because carriers owe a duty toward their passengers to afford them safe approaches to the stations and platforms. *Topp v. United Railways Co., supra; Pierce's Executrix v. B. & O. R.R. Co.*, 99 W.Va. 313, 128 S.E. 832 (1925); *Powell v. Philadelphia & R. Ry. Co.*, 220 Pa. 638, 70 A. 268 (1908); *Schlessinger v. Manhattan Ry. Co.*, 49 Misc. 504, 98 N.Y.S. 840 (1906); *Cotant v. Boone Suburban Ry. Co.*, 125 Iowa 46, 99 N.W. 115 (1904).

The Court did hold, however, that the Baltimore Transit Company could be held liable for injuries sustained by a

passenger who slipped on an isolated patch of ice upon alighting from a trackless trolley which had been brought to a stop about four feet from the curb to discharge passengers. A carrier's duty to its passengers continues until the passenger has safely exited the car, so the Transit Company would be liable if its driver should have seen the patch of ice because he would then have had an opportunity to select a safer place to discharge the passenger. *Baltimore Transit Co. v. Brooks,* 224 Md. 242, 167 A.2d 598 (1961).

The rule of law that may be distilled from the cases cited above is, by and large, consistent with the pattern jury instruction relied on by the court in this case. The relationship of carrier and passenger is not confined to the journey itself. It includes not only the duty to transport the passenger safely from one place to another but also, insofar as it is reasonably within the carrier's ability to do so, to provide safe ingress and egress. Therefore, the duty begins when a passenger who has paid his fare or a prospective passenger intending to do so starts to enter upon the conveyance or upon the carrier's station, platform, waiting room, or other facility maintained by the carrier for the passage and convenience of its passengers, and it ends when the passenger has safely exited the conveyance or the carrier's station, platform, or facility. In sum, the duration of the carrier's duty to the passenger is coextensive with the entire period of time the passenger can be said to be in its care.

Appellee did not come under Leatherwood's care until she started to board its bus, which is when she sustained her injuries. It is undisputed, however, that at no time after appellee became a passenger did Leatherwood violate any duty it owed to her. The bus had been brought safely to a stop; its door opened properly to admit passengers; six passengers got safely aboard; the driver did not cause the bus to move; there was no defect in the bus itself.

What was claimed to be defective and thereby caused the injuries was the surface of the shoulder of the highway, over which Leatherwood had no control. Almost one hundred years ago the Court of Appeals stated, "The streets are in no sense passenger stations for the safety of which street railways are responsible." *Baltimore Traction Co. v. State, Use of Ringgold,* 78 Md. 409, 28 A. 397 (1894). Over the ensuing ninety-six years there have been many changes in public transportation, but the principle announced in *Ringgold* is still valid: public highways are not passenger stations for the safety of which common carriers travelling over them are responsible to their passengers.

The only possible basis for a claim against Leatherwood is that it violated a duty to appellant by selecting an unsafe place to stop and admit passengers. But unlike the operator of the trackless trolley in *Baltimore Transit Co. v. Brooks, supra,* who, by selecting the exact place to stop and discharge his passengers, required this passenger to exit onto a patch of ice, the operator of Leatherwood's bus did not select the site where appellee attempted to board. She, with full knowledge of the condition of the surface, superior to that of the bus driver, opted to board the bus at that stop. Leatherwood did not designate that location for a bus stop; its buses stopped there because it had been designated by WMATA and approved by SHA as a bus stop and passengers collected there to board its buses as well as Metro buses.

In summary, there was no evidence whatsoever of any breach by Leatherwood of any duty owed by it to appellee. The court erred by denying Leatherwood's motions for judgment at the conclusion of the case and its motion for judgment *n.o.v.*

## II

It is pellucid that at no time material to this case did appellee ever become, attempt to become, or even intend to become a passenger of WMATA. There was no suggestion,

therefore, that WMATA owed to appellee that heightened degree of care that a common carrier owes to its passengers. The record makes it perfectly clear that the sole basis for WMATA's liability was that appellee was deemed to be its business invitee. Indeed, the trial judge expressly instructed the jury that it could not return a verdict against WMATA unless it found that appellee was an invitee of WMATA.

The court's error lies in the fact that the entire concept of one's liability for injuries sustained by a business invitee as distinguished from a licensee or trespassee simply has no applicability to WMATA.

In the law of torts, "invitee" is a word of art. Its meaning "is more limited than that of 'invitation' in the popular sense, and not all of those who are invited to enter upon land are invitees." Restatement (Second) of Torts, § 332(3), comment (a).

For a succinct definition of "invitee" we may turn to *Sherman v. Suburban Trust Co.*, 282 Md. 238, 384 A.2d 76 (1978):

> An invitee is in general a person invited or permitted to enter or remain on another's property for purposes connected with or related to the owner's business; the owner must use reasonable and ordinary care to keep his premises safe for the invitee and protect him from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety, will not discover.

Using that definition and applying it to the undisputed facts of this case, it is immediately apparent (1) that appellee was not an "invitee" of WMATA at the time she was injured and (2) even if she had been there would have been no breach of duty because (a) there was no "unreasonable" risk and (b) whatever hazard existed was perfectly apparent to and well known by appellee.

 "Owner" is, perhaps, an overly restrictive term. The duty to an invitee is imposed on owners, tenants, and occupiers of land, those having sufficient possession and

control to be answerable to others for its condition. WMA-TA fits none of those categories. The highway is the property of the State of Maryland; it is entirely subject to the control of SHA. WMATA has no authority, much less duty, to maintain it. SHA authorizes and permits WMATA to erect a pole and bus stop sign on the highway property; to that extent WMATA is an invitee or licensee of SHA. The court erroneously relied on provisions of Md.Code (1977) Transportation Article, § 10–204, setting forth the text of the Washington Metropolitan Area Transit Authority Compact, under which WMATA was created. That compact authorizes WMATA to locate, construct, and maintain transit and related facilities. The court noted that WMATA can be held liable for torts committed in the conduct of any proprietary function and concluded that maintenance of a bus stop is a proprietary function. The problem with that conclusion is that WMATA does not "maintain" a bus stop at the place appellee sustained her injuries. It "maintains" nothing more than a pole with a sign on it, notifying prospective passengers that its buses stop at that site. The gravel surfaced shoulder of Pennsylvania Avenue at the location of this bus stop sign is not a WMATA transit facility—it is part of the public highway, the maintenance of which is exclusively under the control of SHA. As we have noted, *supra*, a public highway is not a passenger station for the safety of which bus companies can be held responsible to their passengers. WMATA owed appellee no duty to keep the shoulder of the highway safe for appellee to walk on, stand on, or use as a boarding platform; indeed, it had no right, authority, or power to make any physical changes to the land.

█ Furthermore, the unevenness of the ground surface of the shoulder posed no "unreasonable risk" to appellant for which she would have been able to complain even if she had been WMATA's invitee. The trial court found, correctly, that SHA could not be held liable for the alleged defect in the shoulder. Applying to SHA the same duty to maintain a footpath as a municipality would have, the court

concluded that that duty was to protect pedestrians "not from the customary, permissible uses and conditions, but dangers of a kind that would not be expected by foot travelers, dangers in the nature of traps." (Quoting from *Pierce v. Baltimore*, 220 Md. 286, 151 A.2d 915 (1959).) *Pierce* pointed out that pedestrians are bound to protect themselves from ordinary uses, obstructions, and comparative roughness of the ground. There is no right of recovery against a municipality if the defect is slight or trivial. The evidence in this case disclosed nothing extraordinary by way of any hazardous defect. As a result of normal erosion, the dirt shoulder adjacent to the paved highway became uneven and gravel was added. If the roughness or unevenness of the surface was too slight or trivial a defect to hold SHA, the owner of the land, accountable, it can hardly be said to constitute an unreasonable risk to appellee. Additionally, whatever risk the uneven ground surface of the shoulder posed to pedestrians or prospective bus riders was well known to appellee. She had walked on it many times and, wearing high heeled shoes, had experienced difficulty walking on the loose gravel. She can hardly assert that as an invitee she was not protected from injury caused by an unreasonable risk which she, by exercising ordinary care for her own safety, did not discover.

We hold, therefore, that the trial court erred in denying WMATA's motions for judgment at the conclusion of the trial and for judgment *n.o.v.*, as well as Leatherwood's motions for judgment.

JUDGMENTS REVERSED.

COSTS TO BE PAID BY APPELLEE.