674 A.2d 44

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**

v.

**Natalie Noel READING, a Minor, etc., et al.**

**No. 954, September Term, 1995.**

Court of Special Appeals of Maryland.

March 29, 1996.

90

92

Don C.A. Parker, Assistant General Counsel (Robert L. Polk, General Counsel and Robert J. Kniaz, Deputy General Counsel, on the brief), Washington, DC, for appellant.

Timothy F. Maloney (Camus & Maloney, on the brief), Riverdale, for appellees.

Argued before WENNER, FISCHER and HOLLANDER, JJ.

HOLLANDER, Judge.

This appeal arises from a negligence suit instituted in the Circuit Court for Prince George's County by Natalie Noel Reading, appellee, against the Washington Metropolitan Area Transit Authority ("WMATA"), appellant. Appellee, who is mentally disabled, sought to recover for injuries sustained when she exited a WMATA bus and was struck by a motor vehicle operated by Denise Doyle.[1]

In August 1993, the case proceeded to trial on the issue of liability only. After the presentation of all the evidence, the trial court granted Ms. Doyle's motion for judgment with respect to WMATA's cross-claim, but denied WMATA's motion for judgment. Thereafter, the jury returned a verdict finding that WMATA was negligent and that appellee was not contributorily negligent.

On December 15, 1993, the parties agreed to a damage award in the amount of $175,000, subject to appellant's right to appeal the judgment regarding liability and to file a motion for remittitur on legal grounds. On May 25, 1995, the court denied appellant's motion for remittitur. Appellant now presents several issues for our review:

1. Did the trial court err in failing to grant WMATA's motion for judgment on the following grounds:

 a. As a matter of law, WMATA's duty to Ms. Reading ended when she safely exited the bus onto the curb.

 b. As a matter of law, WMATA's actions through its bus operator were not a proximate cause of Ms. Reading's injuries.

---

**1.** Appellee's parents, William and Natalie Reading, were plaintiffs below and are appellees here. Because the parties have identical claims with respect to liability, which is the only issue we consider, we shall refer only to Natalie Noel Reading as appellee. Ms. Doyle was a defendant below. Ms. Doyle and WMATA filed cross-claims but Ms. Reading dismissed her direct claim against Ms. Doyle. We note, also, that Ms. Doyle has not participated in the appeal.

c. As a matter of law, Ms. Reading was contributorily negligent.

2. Did the trial court err in allowing Ms. Reading's mother, a lay witness, to testify that Ms. Reading functioned at a third grade level?

3. Did the trial court err in instructing the jury that, in considering whether Ms. Reading was contributorily negligent, the applicable standard of care is that of a reasonable person with a similar mental disability faced with similar circumstances?

4. Did the trial court err in failing to grant WMATA's post trial [sic] motion for remittitur on the grounds that Section 80 of the WMATA Compact limits WMATA's liability to an amount no greater than that recoverable under Maryland law against an instrumentality of the State of Maryland?

For the reasons discussed below, we shall reverse, because we agree with appellant that, as a matter of law, WMATA was not negligent. Accordingly, we decline to address the remaining issues.

### Factual Summary [2]

At the time of the accident on January 13, 1988, Ms. Reading was twenty-five years old. Appellee's mother, whose name is also Natalie Reading, testified that, as a result of a traumatic birth, appellee suffers from "minimal brain damage," walks with an abnormal gait, and functions "at a third grade level." Appellee's mother also explained that routine is very important to appellee and she becomes "upset" when it is disrupted. According to appellee's mother, most people who meet appellee would not initially notice her mental disability. In this regard, she testified:

Well, she could not function as say the normal 16, 20, 25 year old person, because after you see [her] for a while or even talk with her and so forth, *a lot of people wouldn't*

---

**2.** We have discerned the facts from the evidence presented at trial, which we shall consider in the light most favorable to appellee.

*realize there is a problem right away, but if you talk with her or are around her a while then you know that there is special problems.*

\* \* \* \* \* \*

There is some things she can cope with and some things she doesn't.

(Italics added).

Appellee received special education at various facilities from the age of six until the age of twenty-one. At the Duckworth School, appellee received lessons in reading, writing, using money, and making purchases. Additionally, in 1979, Duckworth obtained employment for her as a day care aide at Childway Daycare Center ("Childway"). Because of her disability, appellee qualified for a WMATA handicapped photographic identification card ("I.D."), which lists her name and social security number, and entitles her to half price bus fare.

Prior to her placement, Duckworth instructors taught appellee how to ride public buses in order to travel to and from Childway. Appellee learned to display her special I.D. card when boarding the bus, to pay the fare, and to sit in the front of the bus. Additionally, appellee was instructed always to walk in front of the bus, to look both ways before crossing, and to obey cross walk signals after exiting the bus. Appellee's mother confirmed that her daughter knew "how to interpret" crosswalk signs, to recognize crosswalks, and to watch for traffic. WMATA did not participate in appellee's training.

Appellee's mother testified that, on the day of the accident, her daughter was "definitely" able to travel by herself on the bus. Indeed, by the early 1980's, with her parent's consent, Ms. Reading began riding WMATA buses to and from Childway, without supervision. Since the start of appellee's job placement, she routinely traveled on two buses. First, at the corner of Dartmouth Avenue and Calvert Road, appellee took WMATA's number 86 bus, which traveled southbound on U.S. Route One, a four lane road with a turn lane in the middle. She ordinarily exited the bus at a designated stop located at the College Park Shopping Center, approximately one block

south of Knox Road. From the bus stop, appellee would walk north along Route One to the intersection of Knox Road, which was governed by a traffic light. Then, in order to reach Childway, she would cross Route One to transfer to WMATA's number 82 bus, which travels northbound.

On January 13, 1988, Richard Underwood, a WMATA employee, drove WMATA's number 86 bus, in place of the regular bus driver. At trial, Underwood testified that Ms. Reading boarded the bus at the corner of Dartmouth Avenue and Calvert Road, showed him her handicapped I.D., paid the reduced fare, and took a seat in the front of the bus. As part of his employee training, Underwood stated that he had received instruction in ensuring that handicapped passengers "get on safely and alight safely and watching out for their welfare." He also noticed that Ms. Reading walked in an unusual manner, with a leg that dragged a little bit, but he assumed only that she was physically disabled; he was unaware of any mental disabilities.

Underwood further explained that, after appellee boarded the bus, he drove southbound on Route One, in the direction of Knox Road. He also testified that, as the bus approached the intersection of Route One and Knox Road, he saw the 82 bus across the street, traveling in the northbound direction, and heard appellee remark, "my bus, my bus." For that reason, Underwood stated that, with his headlights, he signaled the number 82 bus to wait and he stopped his bus just prior to the intersection of Route One and Knox Road, in the curb lane of southbound traffic, to allow appellee to exit. This was not a regular bus stop, however.

Nevertheless, according to Underwood, he pulled the bus over at an angle and "put the last step o[f] the bus in the doorway right over the curb," along the sidewalk. Underwood also testified that the place he stopped had a "normal sidewalk" and was physically indistinguishable from a regular WMATA bus stop, aside from the absence of a bus stop sign or a rain shelter. He added that WMATA policy directs bus drivers generally to use bus stops, but that bus operators may

pick up or discharge passengers at an unmarked location if done safely. Underwood also said that Ms. Reading would have missed the number 82 bus if he had stopped at the usual bus stop; he explained that, "[i]f I had brought her up to the next bus stop, . . . she would have had two blocks to walk back . . . [and] the other driver would have said, it's too long, I got to go." Moreover, if Ms. Reading had missed the other bus, Underwood said she would have had to wait fifteen to twenty minutes for the next bus to arrive.

Additionally, Underwood testified that "before [appellee] even got [to] the door, . . . I said I'll put you off right over here at this corner. Walk behind the bus. I already signaled him. He knows you are coming. . . ." Underwood stated that after Ms. Reading exited the bus, she began to cross the street. As the traffic light in his direction was green, he shouted, "no." He also honked at Ms. Reading, who was on Route One directly in front of the bus. Thereafter, appellee was struck by Ms. Doyle's car.

Christine Hanson, a passenger on the number 86 bus, also testified. She stated that, before the bus reached the intersection of Knox Road and Route One, she heard appellee "shou[t] that she wanted to catch the bus that was coming down the other side of the street. . . . [and] said something like oh, oh, there goes the 82." Ms. Hanson further said that, immediately thereafter, appellee "jumped out of her seat and ran for the door, and the bus driver opened the door and let her out, and then she ran in front of the bus into the traffic" traveling southbound on Route One. She did not remember whether Underwood gave appellee any instructions when appellee exited the bus.

Ms. Reading also testified in her own behalf.[3] She stated that she was very good at looking both ways and reading

3. Of course, we did not observe the demeanor of Ms. Reading, and do not know whether her appearance suggests some type of mental disability. Nevertheless, based on the "cold record," we observe that, although Ms. Reading may have a mental disability, her testimony was not unusual in nature. To the contrary, she understood the questions,

traffic signs when she crossed streets on her way to work. She further stated that, before the accident occurred, she never experienced problems travelling by bus. Appellee recounted that, on the date of the accident, she boarded the number 86 bus at her regular bus stop and sat behind the driver. She did not remember seeing the 82 bus coming in the other direction or shouting, but she remembered that after the 86 bus stopped at the intersection of Knox Road and Route One, Underwood told her to "walk behind the bus" before she got off the bus. Nevertheless, Ms. Reading stated that she disregarded Underwood's instructions and walked in front of the bus, because at Duckworth, "I always got taught to go in the front, never go behind a bus, because it can roll right on top of you." Appellee then stated that, after waiting approximately one second, she saw that the light facing the bus was red and she began to cross Route One in front of the bus. As she began to walk slowly across the street, she looked straight ahead and did not see oncoming traffic. Nor did she remember whether the pedestrian cross walk signs read "Walk" or "Don't Walk."

Two other witnesses who were driving southbound on Route One, in the same direction as the WMATA vehicle, corroborated the testimony that the light facing southbound traffic had turned green and that traffic had started to flow on Route One *before* Ms. Reading *ran* in front of the bus. Moreover, Ms. Doyle stated that, at the time of the accident, she was also travelling southbound on Route One, in the same direction as the bus, at twenty-five miles per hour. She observed that the WMATA bus, which was pulled next to the curb in the right lane of Route One, had a green light. Then, when she attempted to pass the bus, she struck appellee, who *ran* in front of her path.

Corporal David Harris of the Prince George's County Police Department testified that the crosswalk signals were working properly on January 13, 1988 and that they would have read

---

answered in complete and comprehensible sentences, and seemed to have good recall of events.

"Don't Walk" if the traffic light was green for vehicles on Route One.

## Standard of Review

 On various grounds, appellant contends that the court erred in failing to grant WMATA's motion for judgment. In reviewing the trial court's decision to deny appellant's motion for judgment, we "shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made." Md.Rule 2–519(b) (1995). *See also Oaks v. Connors,* 339 Md. 24, 29 n. 4, 660 A.2d 423 (1995); *Hawes v. Carberry,* 103 Md.App. 214, 217, 653 A.2d 479 (1995). Moreover, the court's determination should be upheld "[i]f there is any evidence, no matter how slight, legally sufficient to generate a jury question." *James v. General Motors Corp.,* 74 Md.App. 479, 484, 538 A.2d 782, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988). What the Court said in *Mass Transit Admin. v. Miller,* 271 Md. 256, 315 A.2d 772 (1974) is instructive:

> '[O]rdinary [negligence] is a question of fact to be determined by the jury; that before it can be determined as a matter of law that one has not been guilty of negligence, the truth of all the credible evidence tending to sustain the claim of negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish negligence drawn;'

*Id.,* 271 Md. at 259, 315 A.2d 772 (quoting *Curley v. General Valet Service,* 270 Md. 248, 264, 311 A.2d 231 (1973)). Therefore, we must affirm the court's decision to submit the issue of appellee's negligence to the jury if we find that the evidence, and all of the inferences derived from it when viewed in the light most favorable to appellee, is sufficient to support a verdict of negligence.

## The Contentions of the Parties

Appellee contends that the issue of WMATA's negligence was a question for the jury, because "[t]here were circumstances surrounding the discharge which create a substantial

jury question . . . on whether it was safe for WMATA to allow Ms. Reading to alight in the middle of . . . [Route One], at no bus stop in deviation from her well-practiced route, with confusing instructions, and with the expectation that she was proceeding directly to the 82 station." Appellee asserts that WMATA was negligent because: (1) Reading alighted at a location that was not a regular bus stop; (2) while her status as a passenger continued, Reading was crossing a street to transfer to another WMATA bus; (3) Underwood instructed her to walk in back of the bus to cross the street; and (4) Reading is mentally disabled. In essence, it is the aggregation of WMATA's conduct, coupled with Reading's mental disability, that constitutes appellee's claim of negligence.

In contrast, appellant claims, *inter alia*, that when Ms. Reading reached the sidewalk in safety, she lost her status as a passenger. Therefore, WMATA argues that, at that point, its driver owed no further duty to her. WMATA also asserts that its driver lacked knowledge of Ms. Reading's mental disability and, therefore, it had no special duty to her based on her disability.

In our view, the facts would not establish primary negligence in the case of an adult passenger of ordinary intelligence. Even if negligence were established, the facts would compel a finding of contributory negligence with respect to a passenger who did not have a mental disability. The question, then, is whether Ms. Reading's mental disability, in combination with WMATA's conduct, constitutes negligence on the part of WMATA. In other words, we must decide if Ms. Reading's mental disability necessarily alters WMATA's liability. We conclude that, based on the facts of this case, WMATA was not negligent.

### Discussion

It is well established that a common carrier, such as WMATA, is obligated to use the highest degree of care that is consistent with its mode of transport to ensure the safety of its passengers. *Leatherwood Motor Coach Tours Corp. v.*

*Nathan,* 84 Md.App. 370, 375, 579 A.2d 797 (1990), *cert. denied,* 321 Md. 639, 584 A.2d 68 (1991); *Mass Transit Admin. v. Miller,* 271 Md. 256, 259, 315 A.2d 772 (1974). Thus, a common carrier "owes its passengers a duty to deliver them to their destination as expeditiously as possible, consistent with safety." *Mass Transit Admin.,* 271 Md. at 259, 315 A.2d 772. Moreover, a common carrier's duty to exercise the highest degree of care is not limited to the journey itself. Instead, the heightened duty also requires carriers to provide a safe means of boarding and exiting the conveyance. *Leatherwood,* 84 Md.App. at 376, 579 A.2d 797; 14 Am.Jur.2d *Carriers,* § 982. Nonetheless, a common carrier is not a guarantor of the safety of its passengers. *Leatherwood Motor Coach,* 84 Md.App. at 375, 579 A.2d 797. Rather, " 'the degree of care which is exacted of . . . carriers is subject to reasonable limitation. It is not the utmost and highest, absolutely, but the highest which is consistent with the nature of their business, and there must be due regard to its necessary requirements.' " *Smith v. Baltimore Transit,* 211 Md. 529, 537, 128 A.2d 413 (1957) (quoting *Smith v. Transportation Co.,* 172 Md. 42, 49, 191 A. 66 (1937)).

That Ms. Reading was discharged at a location that is not a regular bus stop would not be dispositive in determining the negligence of WMATA, if Ms. Reading were not mentally handicapped. Indeed, if Ms. Reading were an ordinary adult, the undisputed facts would compel the conclusion that, once she was safely discharged, she was no longer a passenger.

By statute, Maryland does not require buses to discharge passengers only at bus stops, and WMATA policy allows drivers to discharge passengers at undesignated stops that are safe.[4] Moreover, many of the courts that have considered this issue have refused to impose liability merely because a passenger exits at a place that is not a designated bus stop; in the absence of a stop at an inherently dangerous location, liability

---

4. It is readily apparent that buses often are unable to stop at regularly designated spots. For example, illegally parked cars or snow in curb lanes may prevent buses from stopping at specified bus stops.

does not automatically attach. *See, e.g., Smith v. Virginia Transit Co.*, 206 Va. 951, 147 S.E.2d 110, 115 (1966); *Harris v. DeFelice*, 379 Pa. 469, 109 A.2d 174 (1954); *Odom v. Willms*, 177 Neb. 699, 131 N.W.2d 140 (1964); *Hanks v. Georgia Power Co.*, 86 Ga.App. 654, 72 S.E.2d 198 (1952); *Smuzynski v. East St. Louis R. Co.*, 230 Mo.App. 1095, 93 S.W.2d. 1058 (1936). *See also* 13 C.J.S. Carriers, § 543 at 493; Jay M. Zitter, Annotation, *Liability of Motorbus Carrier of Driver for Death, or Injury to, Discharged Passenger Struck by Other Vehicle*, 16 A.L.R.5th 11, § 27 (1994).

The case of *Adams v. Baltimore Transit Co.*, 203 Md. 295, 100 A.2d 781 (1954), is instructive. There, the defendant Baltimore Transit Company was a public carrier that transported plaintiff to work at the Maryland Drydock Company. Railroad tracks, which were jointly controlled by the Baltimore and Ohio Railroad and the Transit Company, were used by the Drydock employees to cross between work and the Transit Company's waiting station. Plaintiff sued Baltimore Transit after he was discharged from a bus and was injured by the sudden movement of two railroad cars as he walked across the tracks.

The Court noted that "[t]he primary question is whether it was the duty of the Transit Company ... to provide a safe way for Adams ... to cross the tracks of the railroad between the Transit Company's waiting station and the premises of the Drydock Company." *Id.* at 304, 100 A.2d 781. Adams argued that the Transit Company knew or intended employees to cross the tracks, and thus it had the duty to provide a safe means to do so. What the Court said in affirming the trial court's grant of a demurrer as to the Transit Company is pertinent here:

　[The plaintiff] was let off the car ... within fifty feet of a street. When he reached that point in safety, the obligation of the Transit Company ceased.... [The plaintiff] was discharged by the Transit Company in a safe place and could have left the waiting station without crossing the Railroad tracks.

*Adams,* 203 Md. at 305, 100 A.2d 781. Numerous cases from other jurisdictions are to the same effect. *See, e.g., Thomas v. Hampton Express, Inc.,* 208 A.D.2d 824, 617 N.Y.S.2d 831 (1994), *cert. denied,* 85 N.Y.2d 803, 624 N.Y.S.2d 373, 648 N.E.2d 793 (1995); *Kramer v. Lagnese,* 144 A.D.2d 648, 535 N.Y.S.2d 13 (1988); *Mitchell v. Chicago,* 221 Ill.App.3d 1017, 164 Ill.Dec. 506, 583 N.E.2d 60 (1991); *Heger v. Trustees of Indiana University,* 526 N.E.2d 1041 (Ind.Ct.App.1988); *Smith,* 147 S.E.2d 110; *Harris v. De Felice,* 379 Pa. 469, 109 A.2d 174 (1954).

In *Harris v. De Felice, supra,* for example, the passenger on the defendant's street car was discharged at the southerly side of the highway, at a place that was not a regular car stop. The space was located between a retaining wall and highway that was "sufficient in width to permit a person to stand thereon." *Id.,* 109 A.2d at 176. After exiting the street car, the passenger stood at the location until the street car started and then crossed the highway, where he was hit by a car. In affirming the trial court's decision to grant the carrier's motion for judgment, the court said:

> The mere fact that a street car discharges its passengers at an unusual stop does not in itself prove negligence. It is only when a passenger is mistakenly led to alight at a manifestly dangerous place which is not the usual stopping place that a carrier may be held liable for any injuries sustained by the passenger.
>
> The controlling question, therefore, is whether the defendant ... discharged the plaintiff at a manifestly dangerous place. It is the plaintiff's position that the place of discharge was obviously perilous because there was no place to stand in safety on the southerly side of the street. The only evidence ... concerning the safety of the space beyond the curb on that side of the street was plaintiff's statement that 'If I stayed where I was, a car might have hit me, because there was nothing there but a little curb.' The only evidence regarding the size of the space [was] ... to the effect that just about one person could stand there.

Under the testimony it is difficult to conceive how liability could be imposed on the defendant corporation. The plaintiff himself had stood at this space at the foot of the retaining wall before committing himself to the cartway. Even apart from [the testimony about the size of the space,] the plaintiff's statement that he might have been hit was a conclusion on his part, unsubstantiated by the physical facts and purely a matter of conjecture.... *[T]he defendant carrier did all that it was required to do under the law since the plaintiff was afforded and did reach a position of safety. That he subsequently, of his own accord, abandoned that site for one more perilous would not stamp the entire area as a manifestly dangerous place....*

*Id.,* 109 A.2d at 176–77. (Emphasis added).

We also find noteworthy the case of *Thomas v. Hampton Express, supra,* in which a bus driver discharged a passenger at an undesignated spot, based on a passenger's request. While attempting to cross the highway, the passenger was struck by a vehicle. The court dismissed the passenger's negligence suit, because the passenger was discharged in a safe place, next to the shoulder of highway. The court concluded that the bus company's duty toward the passenger ceased once she safely exited the bus and attained the status of pedestrian. *Thomas,* 617 N.Y.S.2d at 832.

The case of *Poe v. Detroit,* 179 Mich.App. 564, 446 N.W.2d 523 (1989), is equally helpful. At the request of a thirteen year-old passenger, a city bus driver discharged him in a "no parking" zone, which was not an official bus stop. After the boy safely reached the sidewalk, he started to run across the street to catch another bus, although the cross walk sign was flashing "don't walk." Just as the child stepped into the street, he was struck and killed by another vehicle. The boy's parents sued the city, alleging, *inter alia,* that the bus driver was negligent in stopping at a "no parking" zone. After the trial court denied the city's motion for judgment, the jury rendered a verdict in favor of the plaintiff. But the Michigan Court of Appeals reversed the trial court's ruling with respect to defendant's motion. It concluded that, after the boy safely

reached the sidewalk, his passenger status ended and the bus driver owed him no further duty. *Id.,* 446 N.W.2d at 527.

■ In the case *sub judice,* it is undisputed that the bus driver pulled over to the side of the road to allow appellee to exit the bus. It is also beyond question that appellee safely alighted, without incident. Moreover, appellee did not present any evidence that the location at which appellee was discharged was unsafe, inherently dangerous, or otherwise less safe than her regular bus stop. Indeed, both stops were located at sidewalks along Route One, only one block apart. The only distinctions between the locations concern the designation of one as an actual bus stop, their distance from the number 82 bus stop, and the presence of the crosswalk at the undesignated stop. Although the discharge occurred at a location other than an official bus stop, there was no evidence that it was a dangerous location. Moreover, under the facts of this case, if Ms. Reading were a person without a mental disability, her status as a passenger clearly would have ended when she was safely discharged.

■ Nor are we persuaded that a passenger's intention to transfer to another WMATA bus, even when known to the bus driver, automatically continues his or her passenger status. Ordinarily, the passenger/carrier relationship ceases after the journey has ended and the passenger has safely exited the conveyance. *Leatherwood,* 84 Md.App. at 376, 579 A.2d 797. But, when a passenger alights at a bus station or terminal, the carrier may be held liable for injuries occurring inside the facility while the passenger is transferring to another conveyance. 13 C.J.S. § 968. A carrier is not responsible, however, when a passenger who exits at a location on a public street is injured while crossing the street in order to transfer to another conveyance.

In this regard, the case of *Mitchell v. Chicago, supra,* is helpful. The plaintiff departed from a Chicago Transit Authority ("C.T.A.") bus at a designated stop in order to transfer to a CTA train in the station across the street. There was no crosswalk between the bus stop and the train station and, as

the plaintiff crossed the street, he was hit by a car. In affirming summary judgment in favor of the carrier, the court said:

> [T]he relationship of carrier and passenger 'extends to passengers who are given a transfer for continuous passage upon another conveyance of the carrier. Nevertheless, when the carrier discharges the passenger at an intermediate point or at the end of the journey, be it in a public place or otherwise, the duty to exercise the highest degree of care is suspended and ... is resumed when the passenger presents himself to the conveyance of the carrier within the time and at the place fixed by the contract.' Thus, at the time [the plaintiff] was injured, the passenger-carrier relationship was suspended ... and [b]ased on the facts before us, we cannot conclude that the CTA breached its duty of ordinary care. Mitchell was safely discharged at a designated bus stop. The CTA has no duty to protect its passengers from obvious street dangers.

*Id.,* 164 Ill.Dec. at 508–09, 583 N.E.2d at 62–63 (quoting *Rotheli v. Chicago Transit Authority,* 7 Ill.2d 172, 130 N.E.2d 172 (1955)).

Ms. Reading exited the bus at a public sidewalk along Route One, over which WMATA does not exercise control. At the point that she safely exited from the number 86 bus, she was no longer a passenger; if Ms. Reading had crossed the street safely and had entered the number 82 bus, she would have regained her passenger status. Therefore, if Ms. Reading were not mentally disabled, WMATA would not be liable for appellee's injuries merely because she was crossing the street in order to transfer to another bus.

 Furthermore, in the ordinary situation, WMATA would not be liable based on the driver's directions to a passenger, unless those instructions were the proximate cause of the accident. *See Mackey v. Dorsey,* 104 Md.App. 250, 269–70, 655 A.2d 1333 (1995). *Cf. Mallard v. Earl,* 106 Md.App. 449, 457, 665 A.2d 287 (1995) (in a Boulevard Rule case, the rule is applicable unless the favored driver's unlawful conduct

was a proximate cause of the collision). Proximate cause will only be established if there is a reasonable connection between the defendant's alleged negligence and the plaintiff's injuries. *Taylor v. Feissner,* 103 Md.App. 356, 653 A.2d 947, *cert. denied,* 339 Md. 355, 663 A.2d 73 (1995). Even if the defendant's breach were a cause, in fact, of the injury, there is no liability if a third party's actions, or the plaintiff's own actions, constitute an intervening, superseding force that interrupts the chain of causation. *See Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 157–61, 642 A.2d 219 (1994); *Mackey,* 104 Md.App. at 270, 655 A.2d 1333.

The case of *Bloom v. Good Humor Ice Cream Company,* 179 Md. 384, 18 A.2d 592 (1941) elucidates the issue of proximate cause. There, in response to the invitation of the driver of an ice cream truck, a ten year-old boy crossed the street to buy some ice cream. After making a purchase, the boy walked behind the truck and began to recross the street, when he was struck by a motor vehicle. The child sued the ice cream company, alleging that the driver was negligent "in inviting the said infant Plaintiff to a place of danger, for the purpose of selling him one of his employer's products and in failing and neglecting to see that the said infant plaintiff was safely returned to the east sidewalk . . . after he had consummated his purchase." What the Court said in affirming a demurrer in favor of the ice cream company is pertinent:

> [I]t is important to bear in mind that the accident did not occur when the [child] was approaching the [ice cream truck], or while he remained near the truck. There is no allegation . . . that the [child,] a boy of ten years of age, did not possess the intelligence and judgment of a normal boy of that age, or that he was unfamiliar with the hazards of automobile traffic in the streets of the large city in which he lives. It is well settled in this state that infants are held to the same degree of care as any other child of similar age.
>
> From the alleged facts in this case, it appears very clear that the accident to the appellant was brought about entirely by reasons of the [child] leaving the ice cream truck, walking behind it to a place of between the truck and the

east sidewalk, and the sudden appearance of the automobile. That act on the part of the [child] and the approaching automobile, were the separate and intervening causes of the accident. . . . Even if it be assumed that the [driver] was negligent in some respect, the connection between the alleged negligent acts . . . and the injury, was broken by the intervening, immediate causes, which he had no reasons to anticipate, and over which he had no control.

*Id.,* 179 Md. at 388–89, 18 A.2d 592.

Similarly, in *Cooke v. Elk Coach Line, Inc.,* 37 Del. 120, 180 A. 782 (1935), a passenger who had been instructed to exit the bus and cross the street to transfer to a connecting bus line was struck by a vehicle while crossing the street. Despite the bus company's instructions, the court found that the bus company's duty ended when the plaintiff safely exited the bus and assumed the status of pedestrian. *Id.,* 180 A. at 784. Likewise, in *Pritchard v. City Lines of West Virginia, Inc.,* 136 W.Va. 278, 66 S.E.2d 276 (1951), a bus driver instructed a passenger to cross the street to transfer to another bus, but did not warn the passenger about traffic. Although the passenger was struck by an oncoming vehicle while crossing the street after he exited the bus, the court held that the bus company was not negligent. *Id.,* 66 S.E.2d at 279.

The case of *Sanford v. Bi–State Develop. Agency,* 705 S.W.2d 572 (Mo.Ct.App.1986) also provides guidance in illustrating the issue of proximate cause. There, a bus that was prevented by a parked car from stopping at its regular location stopped adjacent to the bus stop sign, but one lane away from the curb. A thirteen year-old girl exited the bus. Rather than walking to the curb, the girl began to cross the street in front of the bus, where she was struck by a motor vehicle. The court held that the bus driver's actions were not the proximate cause of the girl's injuries. What the court said is noteworthy:

Although [the] driver failed to pull the bus to the curb, his actions were not the proximate cause of [the girl's] injuries. Her injuries were the proximate consequence of her inde-

pendent, intervening act of crossing the street after leaving the bus. The relative positions of the parked car and the bus precluded any traffic from passing the bus to the right and endangering [the girl's] safety while alighting. Once she alighted upon the street, she easily and safely could have walked to the sidewalk unimpeded. Instead, she chose to leave her place of safety by walking in front of the bus into the stream of traffic.

*Id.,* 705 S.W.2d at 575–76. Cases from other jurisdictions considering this issue have reached the same result. *See, e.g., Burton,* 530 N.W.2d at 703; *Poe,* 446 N.W.2d at 530; *Kramer v. Lagnese,* 144 A.D.2d 648, 535 N.Y.S.2d 13 (1988); *Mississippi City Lines, Inc. v. Bullock,* 194 Miss. 630, 13 So.2d 34, 37–38 (1943).

 Here, it is undisputed that appellee did not follow Underwood's directions. Indeed, she testified that she knew to cross in front of the bus. Moreover, appellee testified that she had been traveling by herself, on the same bus route, for years and she knew to obey crosswalk signals. Nevertheless, in order to take another bus, she decided to leave a place of safety, crossed in front of the bus, and entered the street. Clearly, if she were not mentally disabled, her decision to cross the street would constitute the intervening, superseding cause of the accident.

 The foregoing discussion leads us to the question of whether, based on appellee's mental disability, WMATA is liable in negligence when it otherwise would not have been liable. Appellant argues that WMATA did not owe Ms. Reading a higher degree of care because of her mental disability and that WMATA is not liable because the bus driver had no knowledge of appellee's disability. Appellee contends, however, that WMATA owed her a greater duty because of her disability. Maryland courts have never specifically considered whether carriers owe a greater duty of care

to mentally handicapped passengers.[5] Assuming, without deciding, the existence in Maryland of a greater duty of care to a handicapped passenger, it is apparent that such a duty may only be imposed when the carrier knows or reasonably should know of the particular handicap.[6]

The matter of the carrier's actual knowledge of a disability was a factor in the court's decision in *Ortiz v. Greyhound Corp.*, 275 F.2d 770 (4th Cir.1960). There, the Fourth Circuit addressed whether a bus company owed a higher duty of care to a passenger with "impaired vision" who exited a bus and, some two hours later, was struck by another of the company's buses when he wandered from the waiting area. The plaintiff claimed that, based on his visual infirmity, which was known to the carrier's baggage attendant, he was entitled to a higher degree of care than the ordinary passenger. The court concluded, that, after spending two hours in the waiting room, the plaintiff lost his passenger status. Nevertheless, the court recognized that a carrier owes a passenger the duty to exercise the highest degree of care with respect to safety, and that this duty extends to waiting areas and the "safe means of egress from the vehicle...." *Id.*, 275 F.2d at 772. But, the court also said that, even if the carrier's baggage attendant were aware of the plaintiff's infirmity, the carrier's duty to him "terminated when [the attendant] observed [the plaintiff] in the safety of the waiting room," because the baggage

---

5. By way of analogy, Maryland has held that a carrier owes a greater duty of care to an intoxicated passenger, if the carrier knows or reasonably should know of the passenger's condition. *Veenstra v. United Railways and Electric Co.*, 148 Md. 512, 129 A. 678 (1925). *See also O'Leary v. American Airlines*, 100 A.D.2d 959, 475 N.Y.S.2d 285 (1984); *Leval v. Dugoni*, 444 So.2d 778, 780 (La.App.1984).

6. During the discussion with respect to WMATA's motion for judgment, the court asked whether the bus driver knew that Ms. Reading was disabled. We note, however, that WMATA did not ask the court to instruct the jury regarding the driver's knowledge of appellee's disability. Nevertheless, in our view, the issue of the carrier's knowledge is subsumed in the question of whether WMATA is liable based on a special duty owed to a handicapped passenger.

attendant was "justified in believing that [the passenger] was not in any danger." *Id.* at 775.

Courts in other jurisdictions have held that a carrier owes a greater duty to a handicapped person if the passenger's condition has been made known to the carrier or is readily apparent. *Montgomery v. Midkiff and Transit Authority of River City,* 770 S.W.2d 689, 690 (Ky.Ct.App.1989); *Paolone v. American Airlines, Inc.,* 706 F.Supp. 11, 12 (S.D.N.Y.1989); *Heger v. Trustees of Indiana University,* 526 N.E.2d 1041, 1043 n. 4 (Ind.Ct.App.1988); *Crear v. National Fire & Marine Ins. Co.,* 469 So.2d 329, 334–35 (La.App.1985). *See also Cary v. New Orleans Public Serv.,* 250 So.2d 92 (La.App.), *cert. denied,* 259 La. 808, 253 So.2d 67 (1971) (the driver was not expected to know that aged passenger might need special help when passenger "manifested no physical disability or infirmity"). But a common carrier is not required to take affirmative steps to discover a passenger's disabilities. *See generally* E.B. Morris, Annotation, *Duty of Carrier to Discover Abnormal Condition of a Passenger,* 124 A.L.R. 1428 (1940). As the court in *Crear* said,

> [A] common carrier's duty to assist a disabled passenger is not determined solely by the fact of the disability. The disability must be one that has somehow been made known to the carrier, and must be one of sufficient seriousness to make assistance necessary under the circumstances presented.... 'The employees of a carrier are not required to use diligence to discover the feeble condition of a passenger and his inability to help himself....' Thus, a carrier that has no reason to know of a passenger's disability owes no greater duty to the disabled passenger than to the normal passenger, and ordinarily is under no duty to investigate the passenger's condition.

*Id.,* 469 So.2d at 334–35 (quoting 13 C.J.S. *Carriers,* § 727, at 1364).

Here, appellee presented no evidence that Underwood actually knew of the disability. Nor does the evidence, even in the light most favorable to appellee, suggest that the driver

reasonably should have known of appellee's *mental* disability. The driver's contact with appellee was obviously quite limited. Moreover, Underwood testified that he could not discern that appellee was mentally disabled from her I.D. or her appearance. Rather, Underwood stated that he thought Ms. Reading was only *physically* disabled because she walked with an unusual gait. Additionally, appellee's own testimony, corroborated by her mother, made plain that appellee's mental handicap was not readily apparent. Appellee's mother testified that many people who meet her daughter are unaware of her mental handicap. Further, appellee had been trained to travel on the bus, has done so for years, and had learned how to exit the bus and cross the street.

Apparently, the regular driver who ordinarily drove the number 86 bus knew of appellee's mental handicap. We are unaware of any authority, however, that would impute actual knowledge to Underwood based on what another WMATA bus driver may have known. We are also unaware of any obligation that would have required WMATA not to change its drivers on any particular shift, so long as the change was consistent with its own rules, policies, and procedures.[7] Surely, it would be quite burdensome for WMATA to arrange for the same driver every day, for the convenience of a particular passenger. Nor is it reasonable to require WMATA to inform or alert its many drivers about the identities and disabilities of some of the many passengers that may ride the public bus on any given day.

■■■ In our view, based on Underwood's limited contact with appellee, a reasonable jury could not conclude that Underwood knew or should have known of appellee's mental disability. In any event, even if Underwood knew or should have known of appellee's needs, he was not negligent in meeting them. After learning that appellee wanted to transfer to the number 82 bus, he signaled its driver to wait for her.

---

7. Indeed, appellee was not obligated to travel only on a certain schedule or on a certain route.

In order to help her, he stopped the number 86 bus at the curb, in advance of the regular bus stop, to enable her to reach the number 82 bus before it departed. The accident was, of course, most unfortunate. Nevertheless, under the circumstances of this case, appellant was not negligent. Therefore, the court erred in failing to grant WMATA's motion for judgment.

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. COSTS TO BE PAID BY APPELLEE.