469 So.2d 329 (1985)
Nancy B. CREAR, et al., Plaintiffs-Appellees,
v.
NATIONAL FIRE & MARINE INSURANCE COMPANY, et al., Defendants-Appellants.
No. 16914-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1985.
Rehearing Denied June 7, 1985.
*330 Bruscato, Loomis & Street by Anthony J. Bruscato, Monroe, for plaintiffs-appellees.
*331 Davenport, Files & Kelly, Hayes, Harkey, Smith & Cascio, Monroe, Lancaster, Baxter, & Seale by Edgar H. Lancaster, Jr., Tallulah, Lavalle B. Salomon, Joseph D. Cascio, Jr., P.C., Monroe, for defendants-appellants.
Before HALL, SEXTON and LINDSAY, JJ.
HALL, Judge.
On December 3, 1980, Mr. Alex Crear, an 84-year-old senior citizen, was taken to the post office in Tallulah, Louisiana in a van loaned to the Madison Counsel on Aging (MCA) by the Delta Community Action Association (DCAA). The van was driven by Mr. Thomas Bangs, an employee of MCA. As Mr. Crear was walking to the post office building from the post office parking lot space in which the van was parked, he was struck by a car that was backing from another parking space. The driver of the vehicle which struck Mr. Crear drove away and was never identified. Mr. Crear sustained a fractured hip and died later that same month as a result of complications following surgery on the hip. Wrongful death and survival actions were brought by Mr. Crear's widow and two children against DCAA, MCA, the driver of the van, and the van's insurer.
The trial court considered Mr. Crear as handicapped, and considered the van driver's failure to further assist Mr. Crear to the post office building as a proximate cause of the accident. The court found that the liability portion of the van's insurance policy afforded coverage for this accident. The trial court further found that the insurance policy on the van covered the accident under the policy's uninsured motorist provisions. The judgment, rendered against all defendants in solido, and declaring that the insurance policy covering the van provided liability coverage of $100,000 and uninsured motorist coverage of $100,000, awarded a total of $111,268.75 in damages to Mr. Crear's widow and two children. All defendants appealed and plaintiffs answered the appeal.
On appeal the van's insurer, National Fire and Marine Insurance Company, asserts that the trial court erred in finding: (1) that the driver owed a duty to Mr. Crear to escort him across the parking lot, (2) that a causal relationship existed between the accident and the maintenance and use of a vehicle under the terms of bodily injury-liability coverage of the van's insurance policy, (3) that Mr. Crear was an insured under the UM provisions of the policy, (4) that insufficient proof existed to show a selection of lower uninsured motorist limits, and (5) that plaintiffs were entitled to $105,000 in general damages. Another specification of error added by the remaining defendants is that DCAA was in no way liable as a consequence of loaning vans to MCA. The only specification of error made by plaintiffs is the insufficiency of the awards.
On appeal, the determinative issues are whether the van driver owed a duty to Mr. Crear to further assist him in safely reaching the post office building, and whether the accident in this case was covered by the provisions of the van's insurance policy. We find that the van driver owed no duty to further assist, and thus find that there can be no recovery under the liability provisions of the policy. We further find that coverage was not afforded to the decedent under the uninsured motorist provisions of the policy. Accordingly, the judgment of the trial court is reversed.

THE FACTUAL BACKGROUND
DCAA and MCA are both non-profit corporations serving the Madison Parish area. Both receive state and federal funding, and have overlapping goals in the area of providing services to the elderly. Mr. Audrey Ogden, the director of MCA, testified that he and Mr. Carl Smith, director of DCAA, tried to coordinate the two programs as best they could. Mr. Smith testified that DCAA loaned four vans, including the one in which Mr. Crear rode, to MCA. Apparently, one of the four vans loaned to MCA was equipped with a wheelchair lift, and was used to transport individuals who were not able to ambulate independently. The *332 van in which Mr. Crear rode, however, was used by MCA to transport elderly citizens who were able to ambulate with little or no assistance.
Mr. Ogden testified that individuals who wished to make use of MCA's transportation services were first certified by the Department of Family Services (DFS). A judgment was made by DFS as to whether MCA could transport those who had applied for the service, and whether those who applied would require assistance. Mr. Ogden noted that MCA did not provide such assistance, but stated that DFS would furnish an escort to certified individuals needing assistance who wanted to travel on one of the vans. No evidence was introduced to show that Mr. Crear had been determined by DFS to need assistance. Mr. Bangs, the driver of the van, testified at trial that all of the individuals he transported could walk and get around by themselves, and that while he thought these individuals were able to get on and off the van without assistance, the policy was to always offer assistance "whether they wanted it or not."
The testimony presented at trial showed that Mr. Crear was an active, independent individual who neither requested nor welcomed assistance. Thomas Bangs stated in his deposition that Mr. Crear got around well and never requested any help. Arcola McCall, who had known Mr. Crear for twelve years, who attended the same church as Mr. Crear, and who apparently was the only eyewitness to the accident, testified that Mr. Crear was very spry and needed no one to help him around. She also testified that she never noticed him to be hard of hearing. Similarly, Mr. Coleman Blackmon, who worked with Mr. Crear on small carpentry jobs for a number of years up until the time of the accident, testified that Mr. Crear needed no help to get around, but was "a good active man." Mr. Blackmon's testimony about driving Mr. Crear to the store on several occasions is indicative of Mr. Crear's ability to function without assistance:
Q: And he would get out of the car and go into the store?
A: Get out, yeah, he'd get out and go on in, walk in just as good as I could. He didn't have no, didn't walk with no stick or nothing.
Q: And he'd go in by himself?
A: Yeah. Go in there by himself.
Q: You didn't have to help him in or guide him around?
A: No, he never had to have no help. He could get around and get about, yeah.
Q: And that was true up until the time he had his accident?
A: Yes sir.
Mr. Crear's daughter, Fannie Releford, stated that Mr. Crear looked young for his age, and that she thought he could walk faster than she could. Even Mr. Crear's wife, Mrs. Nancy Crear, stated that Mr. Crear didn't need any help to walk, and didn't want anyone to help him. She noted that Mr. Crear only wore glasses when reading and when doing carpentry work. However, despite Mr. Crear's apparent lack of serious vision problems, Dr. John Evans, who took a medical history and did a physical examination of Mr. Crear following the accident, testified that Mr. Crear had a mature cataract in his right eye. Mr. Crear indicated to Dr. Evans that he had lost most of the vision in his right eye over the prior two years, and had experienced some dimming of vision in the left eye. While Dr. Evans could not say how well Mr. Crear could see out of his left eye, Dr. Evans did say that Mr. Crear did not suffer from senility, and that while Mr. Crear did have some hearing loss, it was not difficult to communicate with him.
On the day of the accident, Mr. Crear and several other passengers were being taken to a location at which a hot lunch would be served. Mr. Crear asked Mr. Bangs to stop the van at the post office so that Mr. Crear could pick up his social security check. Mr. Bangs testified that Mr. Crear's request was not unusual, and that Mr. Bangs had taken Mr. Crear to the *333 post office for that purpose on three or four occasions in the past. Mr. Crear had been a regular passenger on the van driven by Bangs for six or seven months. Prior to riding with Bangs, Mr. Crear had used the van's service regularly for several years.
When Bangs drove into the post office parking lot, only two parking spaces were available. Both spaces were located on the right side of the parking lot. The parking lot consisted of a drive-through lined on the right and the left for angle parking. The right side of the lot on which Mr. Bangs parked was the side opposite the post office building so that it was necessary for Mr. Crear to walk across the drive-through after exiting the van. After parking the van, Bangs got out, opened the door for Mr. Crear, and placed a milk crate on the pavement to help Mr. Crear step down. Mr. Bangs then took Mr. Crear's hand and helped him exit the van. When Mr. Crear had both feet on the ground, Mr. Bangs took Mr. Crear's left arm and guided him to the end of the van. After observing no moving traffic, Mr. Bangs allowed Mr. Crear to proceed on his own toward the post office. Mr. Bangs then returned to the van.
At the time his deposition was taken, Mr. Bangs was questioned about the extent of the assistance he gave Mr. Crear in exiting the van:
Q: And why was it that you decided not to continue holding Mr. Crear with your right hand and his left arm and take him across that drive area into the post office?
A: We, we never did assist them all, all the way. We would carry them to the end of the van. And he had been going to the post office all the time.
Q: But you assisted him by holding his arm.
A: Right.
Q: Why did you do that?
A: Boarding and unboard the van, to the end of the van.
Q: Well, as I understand it, he came out of the van by himself, and you were on, standing on the parking lot.
A: No, he didn't come out of the van by himself. I helped him out of the van and took him to the end of the van.
Q: While you were, while you were standing on the parking lot.
A: Right. I helped him to the end of the van and come as far as I help all of them, you know, whether they ask for it or not.
Mr. Bang's statement that it was not MCA's policy to accompany passengers once they left the van was corroborated by the testimony of Mr. Eddie Beckwith, MCA's program coordinator for Title 20 (transportation), and a supervisor of the van drivers:
Q: Were you concerned with the safety of the passengers from the time that they, you picked them up until the time you returned them home? Was this part of your responsibility?
A: No. Our responsibility lies in entrance and exit and enroute.
Q: And you, your agency had no responsibility once they left the van?
A: None.
Q: Is that, is that why Mr. Bangs did not escort him into the post office or across the street?
A: We, we're not an escort service. We're transportation.
Mr. Beckwith also testified that the passengers on Bang's van were ambulatory, that it would be presumed that these passengers needed no assistance, and that the drivers had neither the duty nor the responsibility to know or seek information on the health conditions of the individuals being transported.
Arcola McCall was a passenger in an automobile parked a couple of parking spaces away from the vehicle that backed into Mr. Crear. She was seated in the right rear passenger seat, and happened to be looking out her window at the parking lot at the instant the accident took place. Because her window faced the spot at *334 which the accident took place, she had a close, unimpeded view of Mr. Crear's being struck. She testified that Mr. Crear was about half-way across the drive-through when the car backed out and "thumped" him.

THE SCOPE OF THE VAN DRIVER'S DUTY
In Foster v. Houston General Ins. Co., 407 So.2d 759 (La.App. 2d Cir.1981), writ denied, 409 So.2d 660 (La.1982), a mentally retarded youngster was improperly supervised by his teachers on an off-campus walking trip, and was struck by an oncoming vehicle when he suddenly dashed into the street. In determining the nature of the legal duty owed by the defendant teachers to the retarded student, this court looked to the nature of the relationship between the teachers and the student, the student's mental retardation, and the hazards to which he was exposed on the walking trip. Using a similar approach in the present case, the duty of MCA and its driver to Mr. Crear will be analyzed in light of three considerations: (1) the relationship between the parties, (2) the nature and extent of Mr. Crear's disabilities, and (3) the hazards to which Mr. Crear was exposed in walking to the post office building.
The relationship between MCA and Mr. Crear was very similar to the relationship between a common carrier and its passengers. MCA provided a transportation service which, like that of a common carrier, entailed safely loading, safely transporting, and safely unloading the passengers utilizing the service. Thus, the duty owed Mr. Crear by MCA was similar to that owed by a common carrier to its passengers. It is well established that common carriers, such as buses or taxis, assume a high duty of care to their passengers. While common carriers are not insurers of their passengers, they are required to exercise the highest degree of vigilance, care, and precaution for the safety of those whom they transport. Teer v. Continental Trailways, 341 So.2d 1306 (La.App. 3d Cir.1977). While MCA's duty may or may not have been as stringent as that of a common carrier, it is unnecessary to decide that issue since, as discussed below, we find that MCA breached no duty to Mr. Crear even if its duty was equal to that of a common carrier. Certainly, no evidence was introduced showing that MCA had undertaken to provide a transportation service to Mr. Crear entailing a more rigorous duty than that assumed by a common carrier.
Once a common carrier safely unloads a passenger, the carrier's high duty of care ordinarily is considered as completely discharged. In Deason v. Greyhound Corporation, 106 So.2d 348 (La.App. 1st Cir.1958), a Greyhound passenger, Marcus Deason, requested to transfer to a Continental Trailways bus at a point on Scenic Highway just on the outskirts of Baton Rouge. In response to his request, the two buses stopped on opposite sides of the highway to permit the transfer, but Deason was struck by a truck as he attempted to cross the highway. With regard to the duties of Greyhound in this situation, the court stated:
[W]hen it safely unloaded Deason on the west side of Scenic Highway it completely discharged to him, so far as it was concerned, the duties resting upon it, as the common carrier, notwithstanding, that its operator knew that Deason intended to cross the Scenic Highway in order to become a passenger on the Trailways bus.
The court also noted:
There was nothing wrong with Deason's senses and the dangers of traffic on Scenic Highway was [sic] obvious and apparent to Deason and he needed no warning nor was the driver under a duty to warn him of a danger which was apparent, obvious, and known to every person in good mind and sense.
A somewhat similar situation was presented in Teer, supra. There, the driver of a Continental Trailways bus inadvertently passed the intersection at which the passenger, a retired college teacher, had planned to exit the bus. Although the bus driver suggested Miss Teer remain in the *335 bus until it stopped a short distance further up the street at a well-lighted service center, Miss Teer opposed the driver's suggestion, and voluntarily disembarked at a point near the northeast corner of the intersection she had originally chosen as her destination. Sometime after exiting the bus, Miss Teer was struck by an automobile as she was crossing the street. The court described the carrier's duty under those facts as follows:
[O]nce a passenger freely disembarks at his chosen destination free from harm, his status as a passenger, and the public carrier's contract to transport for hire, cease. At that point the public carrier only owes such person the duty of ordinary careit is under no duty to warn the former passenger of "a danger which is apparent, obvious, and known to every person in good mind and sense" (Deason v. Greyhound Corporation, 106 So.2d 348 (La.App. 1st Cir.1958), nor to personally transport, convey, or assist the former passenger in crossing a street or highway. (Citations omitted)
From the two cases discussed above, it is apparent that if Mr. Crear were characterized as "a person in good mind and sense," the van driver would have owed Mr. Crear no duty beyond that of ordinary care once the driver had safely unloaded Mr. Crear from the van. This would be true even if the van driver in the instant case owed the same high duty of care to passengers as a common carrier. On the other hand, because common carriers can owe a greater duty to disabled passengers, our inquiry now turns to the second of the three previously listed considerationsthe nature and extent of Mr. Crear's disabilities.
In considering the proper weight to be given Mr. Crear's disabilities in a determination of the duty of care owed him, we initially note that no disability is presumed merely because of Mr. Crear's age. As stated in LaCava v. City of New Orleans, 159 So.2d 362 (La.App. 4th Cir.1964) in the context of the contributory negligence of a seventy-year-old man, "It is not advanced age alone, but rather disability resulting from advanced age (or other cause) which affects the test of care required." Of course, in the instant case the evidence revealed that Mr. Crear suffered from both poor eyesight and diminished hearing. His eyesight was by far the more serious disability since he had lost most of the vision in his right eye with some dimming of vision in the left. On the other hand, his hearing loss was apparently minimal since there was no difficulty in communicating with him.
We further note that a common carrier's duty to assist a disabled passenger is not determined solely by the fact of disability. The disability must be one that has somehow been made known to the carrier, and must be one of sufficient seriousness to make assistance necessary under the circumstances presented. In 13 C.J.S. CARRIERS § 727, p. 1362, the general rule is stated: "In the absence of any apparent necessity for personal assistance to passengers boarding or alighting, the carrier is not required to furnish it." Furthermore, "The employees of a carrier are not required to use diligence to discover the feeble condition of a passenger and his inability to help himself ...." 13 C.J.S. CARRIERS § 727, p. 1364. The action taken by the court in Teer, supra, is in accord with this reasoning since although Miss Teer was 62-years-old and allegedly had poor eyesight, the court noted that she had "no glaring physical or mental impediments" and that she never requested assistance. Similarly, in Cary v. New Orleans Public Service, 250 So.2d 92 (La.App. 4th Cir.1971), writ refused, 259 La.808, 253 So.2d 67 (La.1971), where a 75-year-old woman fell as she stepped down from a bus because she was unaware that the bus was not parked adjacent to the curb, the court noted:
Despite her 75 years of age at the time of the accident plaintiff manifested no physical disability or infirmity. Nor was there any other reason for the driver of the bus to suspect that plaintiff might need special assistance in descending the steps prior to her fall.
*336 Thus, a carrier that has no reason to know of a passenger's disability owes no greater duty to the disabled passenger than to the normal passenger, and ordinarily is under no duty to investigate the passenger's condition. The foregoing legal principles show that in the instant case, MCA and its driver simply did not owe any duty to further assist Mr. Crear to the post office. While Mr. Crear did suffer from a disability, the disability was not apparent to the driver, to Mr. Crear's acquaintances, or even to his wife. He was still able to read and to do carpentry work, and was said by all to be very spry and active for his age. Nor did Mr. Crear request assistance from the driver either on the day of the accident or on past occasions. In short, there was nothing in Mr. Crear's appearance, actions, or words to place MCA or its driver on notice that Mr. Crear should be given assistance. Furthermore, the evidence did not show that MCA actually had or was under any duty to gather information from any other source about possible disabilities from which Mr. Crear might suffer.
Finally, we turn to the last of the three considerations previously listedthe hazards to which Mr. Crear was exposed in walking to the post office building. Nothing about the design or construction of the small post office parking lot presented any hazards greater than those ordinarily associated with a typical small parking lot situation. While the lot was full on the day of the accident so that crossing the lot was somewhat more hazardous than crossing on a day when the post office was less busy, the danger posed was not significant. In stopping to accommodate Mr. Crear, the van driver made his stop at a place that was designed for the purpose, and that was neither unusual nor hazardous. The only danger to which Mr. Crear was exposed was that of localized parking lot traffic, and this danger was not unreasonable.
In summary, after taking into account all three considerations initially listed, we find that MCA and its driver owed no duty to assist Mr. Crear, and that the trial judge erred in finding that failure of the van driver to assist Mr. Crear was a proximate cause of the accident. There being no negligence on the part of the van driver, there can be no recovery under the liability provisions of the van's insurance policy.

COVERAGE UNDER THE VAN POLICY'S UM PROVISIONS
Although none of the defendants in this case breached a duty of care to Mr. Crear, the passengers occupying the van were covered in the event of an accident involving a hit-and-run vehicle by the UM coverage provisions of the van's insurance policy. The policy defined a hit-and-run vehicle as "a highway vehicle which causes bodily injury to an insured arising out of physical contact of such vehicle with the insured ...." An "insured" is defined in part as "any other person while occupying an insured highway vehicle." The term "occupying" in turn is defined in the policy as "in or upon or entering into or alighting from." Thus, Mr. Crear would have to have been "occupying" the insured van at the time of the accident in order to qualify under the policy provisions.
Obviously, Mr. Crear was neither "in or upon", nor "entering into" the van when he was struck. He could only be considered as "occupying" the van if he could be considered as "alighting from" the van.
In Day v. Coca Cola Bottling Co., Inc., 420 So.2d 518 (La.App. 2d Cir.1982), this court addressed the meaning and scope of the term "while alighting from" in an automobile policy's UM coverage provisions. We held that it is not physical contact with the vehicle that serves as a basis for determining whether a person is injured while alighting from a vehicle, but the relationship between the person and vehicle. The relationship in turn involves two separate factors: time and distance. When the time and distance factors are no longer proximate to the risk to which a person exposes himself while alighting from a vehicle, coverage ceases. The person at some time and at some distance "loses" the UM *337 protection. In Day, the time and distance relationship was not attenuated by either factor since the injured party was never more than twenty-four inches from the vehicle in which he had been riding, and since no more than "several seconds" elapsed from the time the vehicle was parked until the accident took place.
While the situation presented in Day approached the limit of what may still be considered as "alighting from" a vehicle, the situation in the present case exceeds that limit. Although one may argue that the time factor may have been no more attenuated in this case than in Day, the same cannot be argued convincingly with regard to the distance factor. While the injured party in Day was never more than twenty-four inches from the vehicle from which he was alighting, Mr. Crear, according to the lone witness to the accident, had walked half-way across the drive-through at the time the vehicle backed out and struck him. It would be contrary not only to the intent of the policy language, but also to common sense to say that Mr. Crear, who exited the van at a parking space, walked to the rear of the van, and then walked half-way across the drive-through, was still "alighting from" and thus "occupying" the van at the time he was struck. Mr. Crear had clearly left the zone of risk to which he was exposed while "alighting from" the van. Therefore, the trial court erred in finding that Mr. Crear was covered under the UM provisions of the van's insurance policy.

CONCLUSION AND DECREE
The loss to Mr. Crear and his family arising out of this accident, caused by the negligence of the unknown driver of the car which struck him, was sad and unfortunate. However, because there was no breach of duty on the part of the defendants that was a legal cause of the accident, and because Mr. Crear was not an insured under the uninsured motorist provisions of the policy issued to the owner of the van, the judgment against the defendants must be reversed.
In accordance with the reasons set forth above, the judgment of the trial court is reversed and the demands of the plaintiffs are rejected at plaintiffs' cost.
REVERSED.