**Louis Jeane BARNHILL, as Personal Representative of the Estate of Peter V. Barnhill, deceased, Plaintiff,**

v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant.**

No. 1:00–CV–12.

United States District Court, N.D. Indiana, Fort Wayne Division.

Feb. 12, 2001.

John F. Lyons, Barrett & McNagny, Fort Wayne, IN, for John F. Lyons, mediator.

John O. Feighner, Haller and Colvin, Fort Wayne, IN, for Lois Jeane Barnhill, Personal Representative of the Estate of Paul V. Barnhill, deceased plaintiff.

Robert T. Keen, Jr., Miller Carson Boxberger and Murphy, Fort Wayne, IN, for Liberty Mutual Insurance Company, defendant.

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the Court on a Motion for Summary Judgment filed by the defendant Liberty Mutual Life Insurance Company on December 15, 2000. Plaintiff Lois Barnhill as personal representative of the estate of Paul Barnhill filed a response to that motion on January 16, 2001 to which defendant filed a reply on January 25, 2001. For the following reasons, the Motion for Summary Judgment will be granted.

## Factual Background

The facts underlying this litigation, while interesting from a legal perspective, are tragic. Paul V. Barnhill ("Mr.Barnhill") was a retired body-shop operator who worked as an independent contractor for Kelly Leasing, Kelly Cars, and Kelly Automotive Group ("Kelly Cars") for approximately three years before his death. In that capacity, Mr. Barnhill delivered and returned leased vehicles throughout the United States and was paid for each trip based either upon mileage or an agreed rate.

On December 16, 1995, Mr. Barnhill, as agent for Kelly Cars, delivered a new van to an employee of Franklin Electric (which was the lessee) in Pennsylvania. Mr. Barnhill was then to return the old leased Franklin Electric van back to Kelly Cars in Fort Wayne.

While returning the leased van to Indiana, Mr. Barnhill was involved in a single car property damage accident along a remote stretch of Interstate 80 in Carbon County, Pennsylvania. Apparently slipping on the snow,[1] the van went across the highway, rode up over a highway guardrail and down a snow-covered embankment.[2]

Pennsylvania State Trooper Mark Michael was dispatched to the scene of the accident. He parked his State Police Jeep alongside the berm of the highway, approximately 60 feet West and 30 feet North of the location of the van driven by Mr. Barnhill. The Jeep's emergency lights were activated.

Trooper Michael was interviewing Mr. Barnhill regarding the accident. While the two were in the process of discussing the accident, the Jeep was struck by a tractor-trailer driven by Harley Branstad. The impact of the collision caused the Jeep to vault over the guardrail and plunge down the embankment until it ended up striking the van which had been driven by Mr. Barnhill. Trooper Michael received severe personal injuries. Mr. Barnhill was pronounced dead at the scene.[3]

As a result of the second accident, suit was filed in the United States District Court for the Middle District of Pennsylvania. Plaintiff Lois Jeane Barnhill, the personal representative and surviving spouse of Mr. Barnhill sued for wrongful death while a claim was brought for the severe injuries received by Trooper Michael. The truck driver, Mr. Branstad, was insured by Harco Insurance Company under a policy with a single limit liability of one million dollars. That case was settled for policy limits with present plaintiff receiving approximately $200,000 and Trooper Michael receiving approximately $800,000.

Plaintiff Lois Barnhill then filed this declaratory judgement action against Liberty Mutual Fire Insurance Company[4] alleging that the leased van was insured by that company and that she was entitled to recover under the policy's underinsured motorist benefits. Liberty Mutual disputes this claim.

At the time of the collision, there was in effect a "Master Lease Agreement" between Kelly Cars and Franklin Electric which provided a procedure whereby Kelly Cars would lease vehicles to Franklin Electric employees in Indiana and else-

1. According to police officers who would later arrive at the scene, on the morning of the accident the roads were wet and there were patches of snow and slush.

2. Testimony from police officers who would later arrive on the scene indicate that given its location (down a snowy embankment), it would not have been possible for the van to be driven back up to the roadway.

3. According to the deposition testimony of a Pennsylvania State Trooper, had there been

no subsequent accident, the state police would, through normal protocol, have given Mr. Barnhill transportation to a "point of safety."

4. Plaintiff received consent from Liberty Mutual to settle the Pennsylvania claim and enter into a Limited Release Agreement. Liberty Mutual reserved the right to deny the underinsurance claim.

where in the United States. Article 13 of the Master Lease Agreement required that insurance coverage be obtained by the lessee with Kelly Cars named as the insured. The provision went on to require that the insurance policy provided by the lessee was to "be in force and protect the Lessor, its agents or representatives while operating such vehicles for or on the direction of the Lessee."

Liberty Mutual insured Franklin Electric's leased vehicles. On December 16, 1995 (the date of the accident) there was in effect a policy[5] that provided for a one million dollar property injury and property damage combined single limit coverage. The policy also included endorsements for underinsured motorist coverage for both Indiana and Pennsylvania. The Declaration Sheet shows that the policy limits for uninsured/underinsured motorist coverage was one million dollars in Indiana and $35,000 in Pennsylvania.

After the accident, Liberty Mutual paid $2,818.84 to the State of Pennsylvania for the damage which occurred when the van driven by Mr. Barnhill ran up over the guardrail. It has also paid Kelly Cars $10,102.99 for the property damage to the van. Liberty Mutual has refused to pay the Estate of Mr. Barnhill, resulting in this lawsuit.

### Application of Law

The present motion for summary judgment is based upon Liberty Mutual's assertion that the estate should not recover for either of two reasons. First, it asserts that Mr. Barnhill was not "occupying" the insured vehicle at the time of the second collision and therefore, under the terms of the policy, was not covered. Second, Liberty Mutual contends that the policy's benefits do not inure to Mr. Barnhill because the insurance provided by Liberty Mutual ceased at the time Mr. Barnhill took possession of the leased vehicles. After a determination of which law governs this dispute as well as a brief review of the standards governing summary judgment, these argument will be considered in turn under separate headings.

### Governing Law

A district court applies the choice of law rules of its forum. *Klaxon v. Stentor Electric Mfg., Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Although the accident at issue in this case occurred in Pennsylvania, the parties agree that the substantive issues in this diversity case should be governed by Indiana law and this Court can accept such an agreement so long as it is reasonable. *See, Speakers of Sport, Inc. v. ProServ, Inc.,* 178 F.3d 862, 864 (7th Cir.1999). The parties' agreement that Indiana law should control is a reasonable one[6] and hence this Court will apply that substantive law to this case.

While Indiana law will govern the substantive law in this case, the procedural law, is of course, governed by federal law.

---

**5.** The policy was issued to Franklin Electric at its principal office in Bluffton, Indiana.

**6.** Both parties cite *Pennington v. American Family Ins. Group,* 626 N.E.2d 461 (Ind.App. 1993) for the proposition that Indiana law should govern this case. There the court held:

> The law of the forum having the most intimate contacts with the facts determines which law governs an action on a contract. *Dohm & Nelke v. Wilson Foods Corp.* (1988), Ind.App., 531 N.E.2d 512, 513. The determination of which state law applies is aided by consideration of several factors: the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the parties

place of business. *Id.* In conflict of law cases involving the interpretation of insurance contracts, the law of the state where the contract is executed controls. *See Travelers Insurance Co. v. Eviston* (1941), 110 Ind.App. 143, 152, 37 N.E.2d 310, 313. An insurance contract is executed in the state where application is made, the premium is paid and the policy is delivered. *Id.*

*Id.* at 464. In this case, the record reflects that the plaintiff's-decedent was an Indiana resident who was returning the van in question to Indiana. The principal location of the insured, Franklin Electric, was Indiana. The place where the policy was delivered was also in Indiana. Hence, under *Pennington,* it is clear that Indiana substantive law should govern this action.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings, affidavits and other material of record show that "there exists 'no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

"Indiana courts have recognized that '[c]onstruction of an insurance policy is a question of law for which summary judgment is particularly appropriate'" since [t]he interpretation of 'an insurance policy involves the same rules of construction and interpretation as other contracts.' *Myles v. General Agents Ins. Co. of America*, 197 F.3d 866, 868 (7th Cir.1999) (citations omitted). "Summary judgment is appropriate 'if, as a matter of law, it is apparent that extrinsic evidence is unnecessary to ascertain the meaning of the policy[,]'" and hence, "[i]f an insurance policy's terms 'are clear and unambiguous, the language of the policy must be given its plain and ordinary meaning.'" *Id.*

With the foregoing principles in mind, the Court now turns to the specific terms of the insurance policy at issue in this case.

*"Occupying the Vehicle" Under the Terms of the Policy*

Both the Indiana and Pennsylvania underinsured motorist coverage[7] endorsement of the policy issued by Liberty Mutual to Franklin Electric provide identical requirements that a person be "occupying" a covered auto to be covered under the policy. Specifically, the policy provides:

A. *Coverage*

We will pay all sums the insured is legally entitled to recover as compensatory damages from the owner or driver of an underinsured motor vehicle. The damage must result from injury sustained by the insured and caused by an accident with an underinsured motor vehicle ...

---

7. The provisions as to whether Indiana or Pennsylvania underinsured motorist coverage applies depends upon whether the "covered

B. *Who Is An Insured*

1. You.

2. If you are an individual, any 'family member'.

3. Anyone else 'occupying a covered 'auto' or a temporary substitute for a covered 'auto.' The covered 'auto' must be out of service because of its repair, servicing, loss or destruction.

Under "Additional Definitions," the policy defines the term "occupying" as follows:

2. 'Occupying' means in, upon, getting in, on, out or off."

(Pf. ex. 7, Indiana Motorists Coverage Endorsement). The term "temporary substitute for a covered 'auto'" is not defined in the policy.

As a basis for claiming that it is entitled to summary judgment, defendant first argues that Mr. Barnhill was not "covered" under the policy because he was not, as required by the policy, "in, getting in, on, out or off" of the van. A review of cases which have construed such language leads this Court to agree.

Whether an individual is "in or about"— or as often used in insurance policies "alighting from"—a motor vehicle has been the subject of very many cases. Some courts look merely at the relationship between the injured party and the insured automobile in terms of time and distance in order to determine whether there should be coverage. *See, e.g., Crear v. National Fire & Marine Ins. Co.*, 469 So.2d 329 (La.App.1985); *Menchaca v. Farmers*, 59 Cal.App.3d 117, 130 Cal.Rptr. 607 (1976). Other courts look at more than time and distance and take into account such things as the intent of the injured party in determining his relationship to the vehicle. *See, Fidelity & Casualty Co. of New York v. Garcia*, 368 So.2d 1313 (Fl.App.1979); *State Farm Mutual Ins. Co. v. Holmes*, 175 Ga.App. 655, 333 S.E.2d 917 (1985).

---

'auto' [is] licensed or principally garaged in, or 'garage operations' conducted in" the particular state.

■ After reviewing the foregoing cases and others in some detail, the Indiana Court of Appeals in *Miller v. Loman*, 518 N.E.2d 486, 491 (Ind.App.1987) decided that "those authorities which have looked to more than mere time and distance in determining whether an injured party was 'alighting from' or 'getting out of' an automobile to be the better reasoned [opinions] and, furthermore, more consonant with Indiana authority." The court went on to list several factors which should be taken into account including "the distance between the accident and the automobile; the time separating the accident and the exit from the automobile; the individual's opportunity to reach a zone of safety; and the individual's intention in relation to the automobile." *Id.* at 491. The court went on to note that "[t]hese factors will, of course, have greater or lesser weight depending upon the circumstances of each individual case" and that "[t]here may be instances in which one of the factors may be determinative, such as where the accident occurs at such a great distance from the automobile as to render it unreasonable to assume the process of alighting had not been completed." *Id.* at 491–92.[8] Application of those factors to the facts presented in this case lead this Court to conclude that Mr. Barnhill was not "occupying" the van at the time of the second accident.

■ The distance factor weighs against a finding that Mr. Barnhill was occupying the van. At the time of the accident, the undisputed evidence is that the van was some 45 feet down a steep, snow covered embankment and Mr. Barnhill was sitting in a state police vehicle on the berm of the highway at a distance of some 60 feet West and 30 feet North of the van he had exited. This distance is roughly equivalent to or greater than that found to counsel against a finding of "occupying" in cases such as *Miller, supra,*[9] and *Lake States, supra,* and indeed the relevant query seems to be whether the person has completed all acts normally performed by the average person in getting out of the vehicle and has embarked upon a course of conduct entirely distinct from acts necessary to exit from the vehicle. *See, Mutual Automobile Ins. Co. v. Barton,* 509 N.E.2d 244, 248 (Ind. App.1987) (collecting cases). Under that standard, it seems clear that Mr. Barnhill had completed that process at the time of the second accident and, to use the language in *Barton* "had accomplished [his] exit from the vehicle" making the "process of 'alighting from' . . . complete." *Id.*

The time factor would also appear to weigh in favor of finding that Mr. Barnhill was not "occupying" the van at the time of the collision. True, there has been presented no direct evidence as to how much time elapsed from Mr. Barnhill's initial plunge over the guardrail and his entry into the trooper's Jeep and the subsequent collision. However, it is clear that prior to the second accident, Mr. Barnhill was able to exit the van, walk up the embankment, get into the Jeep which at some point arrived on the scene, and begin giving information to Trooper Michael. This suggests "that an appreciable amount of time passed before the second accident took place" and that "[t]his is not a case where [the insured] had just exited the vehicle when the second collision happened."

---

8. Just recently, in *Lake States Ins. Co. v. Tech Tools, Inc.,* 743 N.E.2d 314 (Ind.App.2001), the Indiana Court of Appeals "rel[ied] on *Miller* and the plain language of the terms to determine whether [the injured party] was either 'occupying' or 'getting in' the covered vehicle." The court then went on to state that while the four factors in *Miller* were "instructive," the fact that the injured party was some sixty feet from the insured vehicle was determinative in concluding that that party was neither "occupying" or "getting in" the insured vehicle as required by the policy.

9. In *Miller,* the injured party was some thirty feet from the insured vehicle at the time he was struck by an uninsured motorist. This factor was taken into account when the court decided that the injured party was not entitled to recover under a policy which extended protection (much as in this case) to "[a]ny person while in, on, getting into or out of an automobile." 518 N.E.2d at 488.

*Auto–Owners Insurance Co. v. Powell,* 757 F.Supp. 965, 971 (S.D.Ind.1991).[10]

The next factor set forth in *Miller, supra,* is "the individual's opportunity to reach a zone of safety." Here too, the facts suggest that Mr. Barnhill was not "occupying" the vehicle as that term has been construed under Indiana law.

In arguing that Mr. Barnhill had not reached a "zone of safety," plaintiff notes that, in accordance with *Miller,* this factor is given great deference and that there, unlike here, the injured party in that case "never intended to reach a zone of safety" because he had embarked upon a "course of conduct ... entirely distinct from acts reasonably necessary to make an exit from the car." (Pf.Br., pp. 13–14, quoting, *Miller,* 518 N.E.2d at 491). Quotation of such language, however, does not aid the plaintiff for it is clear that Mr. Barnhill, by the time the second accident occurred, had completed all acts "reasonably necessary to make an exit from the car" and in fact had reached a zone of safety.

The decision in *Powell, supra,* is instructive on this score. In that case, the plaintiff was struck by his own vehicle which had been struck by another car as plaintiff was in the emergency area along the median of the road. That notwithstanding, the court concluded that plaintiff had an opportunity to reach safety at the time of the incident writing:

> The court also finds that [plaintiff] had an opportunity to reach safety, as demonstrated by the fact that he walked south and away from the van after having exited it. [Plaintiff] not only walked away from the van, but also reflected and headed back toward the van. There

is, however, no evidence or argument that [Plaintiff] intended to reenter the van. For [plaintiff], having once walked away from the van, to head back to the van and walk away from it once more showed that 'he had embarked upon a course of conduct, entirely distinct from acts reasonably necessary to make an exit from the car ...'. To say that such actions are part of the process of 'alighting from' a vehicle is to stretch that concept too far.

*Powell,* 757 F.Supp. at 971–72 (internal citation omitted). It is of course true that, in this case, there is no evidence that Mr. Barnhill walked away from the van and then returned to it. However, this does not dissuade this Court from analogizing the facts here to those in *Powell.* Certainly if a driver of a vehicle walking in an emergency lane alongside the roadway had an opportunity to reach a zone of safety, a driver who was sitting in a police vehicle along the berm of the roadway has had an opportunity to reach a zone of safety.

In reaching this conclusion, the Court is not unmindful of plaintiff's argument that "the court must question whether or not Mr. Barnhill would have been free to leave Trooper Michael's vehicle after causing property damage to the State's guardrail, if he had wanted a more secure setting to divulge information." (Pf.Br. p. 14). In this Court's view, however, whether or not Mr. Barnhill may have wanted to go somewhere else to discuss the matter is not the issue. Rather, the issue is whether or not Mr. Barnhill had reached a "zone of safety" and this Court must conclude that by sitting in the police Jeep, Mr. Barnhill was in fact in a "zone of safety." [11]

---

**10.** In *Powell,* the injured party was "out of his van for two minutes and perhaps more before the second accident occurred." *Id.* Although this Court cannot pinpoint the exact amount of time that Mr. Barnhill had been out of the van, it would seem that it would be longer than two minutes.

**11.** The Court recognizes that it may seem counterintuitive to suggest that Mr. Barnhill was in a zone of safety when he was sitting in

the. Jeep since, after all, it was the Jeep that was struck and led to Mr. Barnhill's fatal injuries. However, if that were controlling on the question of whether one had reached a zone of safety, the mere fact that there was a second accident would perforce mean that the injured party was not in a zone of safety and hence was still getting out of the insured vehicle at the time of the incident. Such a conclusion would, of course, render the zone of safety inquiry a nullity.

The final factor to be considered in relation to whether Mr. Barnhill was "occupying" the insured vehicle was his intention in relation to the vehicle. Here, the record is somewhat scant although it may be assumed that since Mr. Barnhill was hired to return the vehicle to Fort Wayne, he would have intended to continue on his trip at that point. Both the testimony from police officers and an accident reconstructionist indicate, however, that Mr. Barnhill would not have been able to drive the vehicle out of its location at the bottom of the embankment—it would have had to have been towed. While plaintiff suggests that the vehicle may have been towed up the embankment thereby allowing the vehicle to continue on its way (assuming it was driveable), it appears that the only evidence in the record is testimony from the state police that because of the weather conditions, the vehicle would not have been towed at that time since a lane of the highway would have to be closed. Rather, the state police, as a courtesy, would have transported Mr. Barnhill elsewhere.

Even if it can somehow be said, however, that Mr. Barnhill's intention in relation to the vehicle weighs in favor of finding that he was "occupying" the vehicle under that prong of *Miller*, this Court would still have to conclude that Mr. Barnhill was not "occupying" the vehicle under the other factors in *Miller*. While that decision suggests that the factors may be given various weights depending upon the particular facts of the case and that indeed one factor alone may be deemed to be determinative, this Court does not find that any particular factor is controlling in this case and most certainly not the fact that Mr. Barnhill would have desired to continue on his way.

In a further effort to establish entitlement to the underinsured motorist benefits, plaintiff argues that Mr. Barnhill was in a "temporary substitute" vehicle within the terms of the policy at the time of the second collision. Plaintiff suggests that since the term "temporary substitute" is not defined in the policy it is an ambiguous term and therefore should be construed in plaintiff's favor.

■ "There is no requirement that each and every term in an insurance policy be defined to avoid ambiguity." *Myles v. General Agents Ins. Co.*, 197 F.3d 866, 869 (7th Cir.1999) (citing, *Smith v. Allstate Ins. Co.*, 681 N.E.2d 220, 223 (Ind.App. 1997)). "Furthermore, a term is not ambiguous merely because a controversy exists in which the parties each favor a different interpretation." *Id.*

■ As indicated previously, "[t]he interpretation of an insurance policy, as with other contracts is primarily a question of law for the court." *Cincinnati Ins. Co. v. Amerisure Ins. Co.*, 644 N.E.2d 136, 139 (Ind.App.1994). "If insurance policy language is clear and unambiguous, it should be given its plain and ordinary meaning." *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind.1992); *accord, Ticor Title Ins. v. FFCA/IIP 1988 Property Co.*, 898 F.Supp. 633, 638 (N.D.Ind.1995) ("unless the insurance contract is ambiguous, the court should give to its terms their plain and ordinary meaning."). "If there is an ambiguity, the policy should be interpreted most favorably to the insured." *Id.* "An ambiguous insurance policy should be construed to further the policy's basic purpose of indemnity." *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985). "The fact that the parties disagree as to the interpretation of the contract does not establish an ambiguity; the contract is ambiguous only if it is susceptible to more than one interpretation and reasonable persons would honestly differ as to its meaning." *Standard Mutual Ins. Co. v. Pleasants*, 627 N.E.2d 1327, 1329 (Ind. App.1994).[12]

12. Since an insurance policy is construed in the same way as a contract, whether its terms are capable of more than one interpretation is determined in Indiana by application of the following principles:

1) Words used in a contract must be given their common meaning unless, from the entire contract and its subject matter, it is clear that some other meaning was intended.

2) Words, phrases, sentences and paragraphs of a contract are not to be read alone; the intention of the parties must be gathered from the entire contract.

■ Here, when read in context, it cannot be said that the term "temporary substitute" is ambiguous even though it is undefined. The term "temporary substitute" appears in the definition section relating to "who is an insured" and provides that, among others, an insured is "[a]nyone else 'occupying' a covered 'auto' or a temporary substitute for a covered 'auto'" when the covered auto is "out of service because of its breakdown, repair, servicing, loss or destruction."

In *Deadwiler v. Chicago Motor Club Ins. Co.*, 603 N.E.2d 1365 (Ind.App.1992), the Indiana Court of Appeals, in a case of first impression in this state, was faced with interpreting and applying a "temporary substitute" clause of an insurance policy not unlike that presented in this case.[13] After noting that "[t]he well recognized intent of a 'temporary substitute' clause is not to narrow the coverage of an insurance policy, but to provide the insured with continuous coverage for one operating vehicle on one policy," *id.* at 1367, the court in *Deadwiler* went onto review a number of cases from various jurisdictions including a line of cases flowing from the Sixth Circuit's decision in *Tanner v. Pennsylvania Threshermen & F.M.C. Ins. Co.*, 226 F.2d 498 (6th Cir.1955). The court in *Deadwiler* then concluded:

> Having said this, we apply the *Tanner* rule for 'temporary substitute automobile.' The *Tanner* court found that a substitute car meant 'a car which was in the possession or under the control of the insured to the same extent and effect as the disabled car of the insured would have been except for its disable-

ment.' *Tanner* at 500. Courts applying the *Tanner* rule have required that in order for a car to receive temporary substitute status, that car must be under the control of the insured, or the insured's designee, *see Tanner* at 500; *Carnes,* 440 N.W.2d at 456; *Babineaux[v. Lavergne]*at 404[321 So.2d 401].

*Deadwiler,* 603 N.E.2d at 1369.

In this case, it can hardly be said that the Pennsylvania State Police Jeep was under the control of in the possession of Mr. Barnhill at the time he was sitting in it when the second collision occurred. That being so, it was not a "temporary substitute" vehicle as that term has been construed.[14]

### *"Covered" Vehicle Under the Terms of the Policy*

■ Defendant also asserts that it is entitled to summary judgment because the van in question was not a "covered" vehicle under the policy at the time of the collision. While not necessary for resolution of this case given the foregoing discussion, this Court is inclined to agree.

The policy issued by Liberty Mutual to Franklin Electric at the time of the accident which took Mr. Barnhill's life contained an endorsement which provided that "any lessor that leases an auto to the named insured under an agreement requiring the named insured to provide primary insurance" was an "additional insured." Specifically, the policy provided:

> (A)(1.) Any 'leased auto' designated or described in the schedule will be considered a covered 'auto' you own and not a

---

*PPG Industries v. Russell,* 887 F.2d 820, 824 (7th Cir.1989); *accord, Ethyl Corp. v. Forcum–Lannom Assoc. Inc.,* 433 N.E.2d 1214, 1218 (Ind.App.1982).

**13.** The policy in *Deadwiler* defined a "covered auto" to include "[a]ny auto or trailer you do not own while used as a temporary substitute for any other vehicle described in this definition which is out of normal use because of its: a. breakdown; b. repair; ...". 603 N.E.2d at 1366, fn. 1.

**14.** The Court notes that in the *Deadwiler* decision, the court there also discussed whether or not the "temporary substitute" vehicle was being used to fulfill a duty or obligation of the insured. Even under that standard, it cannot be said that the Jeep which was sitting on the berm of the road was being used to fulfill a prior contractual or legal obligation of Mr. Barnhill. As the defendant points out, things may have been different if the Jeep was being used to tow the van back to Indiana in fulfillment of Mr. Barnhill's employment obligations.

'covered auto' you hire or borrow. For a 'covered auto' that is a 'leased auto; WHO IS INSURED is changed to include as an 'insured' the lessor named in the schedule.

(2.) The coverages provided under this endorsement apply to any 'leased auto' described in the schedule until the expiration date shown in the schedule, or when the lessor or his or her agent takes possession of the 'leased auto', whichever comes first.

The policy clearly limits coverage to the earlier of either the date of expiration as listed in the schedule or until the lessor or his agents takes possession of the vehicle.

Here, the undisputed evidence before the Court is that Mr. Barnhill worked as an independent contractor for Kelly Cars and was its agent. The evidence also shows that Mr. Barnhill had taken possession of the vehicle and was returning it to Indiana at the time of the collision. Under the language excerpted above, it would appear that the coverage provided for the van by Liberty Mutual under the agreement between Franklin Electric and Kelly Cars terminated at the time that Mr. Barnhill took possession of the van.

It is true, as plaintiff points out, that the Master Lease Agreement required that Franklin Electric "insure and keep insured" the leased vehicle "from the time the vehicle is delivered to a representative of the Lessee until the vehicle is sold and legal title passes to the purchaser thereof ...". However, that was a requirement as between Franklin Electric and Kelly Cars and was not an obligation of defendant Liberty Mutual. Hence, while any alleged breach of the Master Lease Agreement may give rise to a claim against Franklin Electric, it would not give rise to a claim against the Liberty Mutual if there was no coverage under the policy. *See, Doherty v. Davy Songer, Inc.*, 195 F.3d 919, 926 (7th Cir.1999) (indicating that under Indiana law, subcontractor was liable for loss resulting from subcontractor's breach of agreement to provide insurance covering contractor for negligence of contractor's employees).

▮ In a final effort to salvage a claim that Mr. Barnhill was driving a "covered" automobile at the time of the accident, plaintiff asserts that defendant has waived its claim to deny coverage. This is because the defendant paid money to the State of Pennsylvania for the damage done to the guardrail and also paid money to Kelly Cars for the damage done to the van. That is, by acknowledging that the policy's coverage applied to settling property damage claims under its terms, defendant has waived the right to deny the underinsured motorist claim arising from the use of the same vehicle.

▮ "[T]he insurer is deemed to have waived a defense to coverage under the policy only when the insured is prejudiced by the insurer's delay in notifying the insured of that defense." *Terre Haute First Nat'l Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336, 1338 (Ind.App.1993). Moreover, the fact that an insurer may have made a payment under another provision of the policy does not estop the insurer from denying coverage. *Johnson v. Payne*, 549 N.E.2d 48, 53 (Ind.App.1990) (absent evidence that potential insured claiming coverage under uninsured motorist provisions acted in detrimental reliance upon insurer's payment pursuant to medical provisions of policy, insurer would not be estopped from denying coverage). "One who alleges and relies upon an estoppel has the burden of establishing all facts necessary to constitute it." *Id.*[15]

---

15. As noted by the Indiana courts, there is a technical distinction between waiver and estoppel but the terms are used interchangeably. As explained in *Gallant Ins. Co. v. Wilkerson*, 720 N.E.2d 1223 (Ind.App.1999):

We note that there is a technical distinction between the terms "waiver" and "estoppel." Waiver is the intentional relinquishment of a known right involving both knowledge of the existence of the right and the intent to relinquish it. *Corrigan v. Al-Trim Corp.*, 700 N.E.2d 481, 484 (Ind.Ct. App.1998), *trans. denied.* The elements of estoppel are the misleading of a party entitled to rely on the acts or statements in question and a consequent change of posi-

Here, plaintiff has wholly failed to allege, let alone establish, the existence of any reliance to her detriment based upon the fact that Liberty Mutual paid other claims under the policy. That being so, plaintiff has not established that Liberty Mutual is estopped from denying coverage in this case.

### Conclusion

On the basis of the foregoing, the Motion for Summary Judgment filed by the defendant Liberty Mutual Life Insurance Company on December 15, 2000 is hereby GRANTED. Judgment shall be entered in FAVOR of the defendant and AGAINST the plaintiff.

tion to that party's detriment. *Tate v. Secura Ins.*, 587 N.E.2d 665, 671 (Ind.1992). In insurance cases, the distinction between waiver and estoppel is difficult to preserve, and courts have found it unnecessary or inadvisable to make such a distinction, often using the terms interchangeably. *Id.*