STEWART, J.
 

 | |Plaintiff/Appellant, Wanda Ricks, is appealing a summary judgment granted in favor of the Defendants/Appellees, City of Monroe, Monroe Transit Authority, and Coregis Insurance Company (hereinafter collectively known as the “City”). For the reasons that follow, we affirm.
 

 FACTS
 

 On January 9, 2002, Mrs. Gladys Ricks was hit by a car and severely injured after exiting a city bus. She was attempting to cross the street in order to go to the Piccadilly Cafeteria in the Twin City Shopping Center.
 

 The city bus runs east and west on Louisville Avenue, which is a five-lane highway with a 40 mile per hour speed limit. The Piccadilly Restaurant is located on the north side of and adjacent to Louisville and is a part of the Twin City Shopping Center. The bus stop is in the middle of the block directly across the street from the Piccadilly Cafeteria.
 

 Mrs. Ricks died three years later as a result of complications from the injuries. Mrs. Ricks’s daughter, Wanda Ricks, filed a lawsuit for the wrongful death of Mrs. Ricks. She made the following contentions:
 

 1. The City was negligent in selecting the location of the bus stop where the accident occurred.
 

 2. The City was negligent in failing to move the bus stop to a safer location after bus drivers assigned to the route notified their supervisors that the location was hazardous and suggested that the bus stop be moved to a safer location.
 

 3. When the bus drivers offered passengers “free returns” so that passengers could avoid the bus stop by going to the end of the line, making the return trip, and getting out at a safer location on the opposite side of the street, the City prohibited the bus drivers from offering these “free returns.” Further, the City threatened to discipline bus drivers who offered these “free returns.”
 

 12The City filed a Motion for Summary Judgment arguing the plaintiff could not prove that the bus stop at issue contained a vice or defect that caused an unreasonable risk of injury or that the injury was caused by the defect. Additionally, the City of Monroe asserted that the plaintiff could not prove a claim pursuant to La. C.C. art. 2317 and/or La. R.S. 9:2800 because this bus stop had been in place for
 
 *861
 
 over 30 years and Mrs. Ricks’s injury was the first of its kind with an alleged connection to it. Therefore, the plaintiff could not establish that the City had actual or constructive knowledge/notice that the bus stop contained an unreasonably dangerous vice/defect. The City also contended that the plaintiff had the burden of establishing that she was injured while on a public conveyance and that she failed to prove her destination. Lastly, the City argued that the plaintiff could not prove causation because the actual cause of her injury was her attempting to cross this busy street and being hit by a vehicle. In response to discovery requested by the plaintiff regarding the uninsured motorist coverage, the City denied ever having uninsured motorist coverage.
 

 On March 23, 2009, the district court granted summary judgment in favor of the City of Monroe, Monroe Transit System, and Coregis Insurance Company, after finding that “the actions of the defendants do not qualify as a cause in fact of the plaintiffs damages or, alternatively, that Mrs. Rick’s conduct was an intervening and or superseding cause absolving the defendant’s from any liability.” The plaintiff appeals, asserting four assignments of error.
 

 1 oLAW AND DISCUSSION
 

 Duty
 

 In the first assignment, the plaintiff argues that the city had a duty to place bus stops in locations where it would be easier and safer for passengers to reach their destinations or to allow passengers to take a free return to the bus stop on the opposite side of the street in order to avoid crossing a hazardous five-lane street. In the second assignment, the plaintiff asserts that, at the least, the City had a duty to exercise reasonable care to protect Mrs. Ricks from the hazards involved in crossing Louisville Street. Since these two assignments are interrelated, we will discuss them together.
 

 Appellate courts review summary judgments
 
 de novo
 
 using the same criteria that govern a district court’s consideration of whether summary judgment is appropriate.
 
 Schroeder v. Board of Supervisors of Louisiana State University,
 
 591 So.2d 342 (La.1991);
 
 Costello v. Hardy,
 
 2003-1146 (La.1/21/04), 864 So.2d 129. A court must grant a motion for summary judgment “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B). Although the summary judgment procedure is favored and must be construed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by law, factual inferences reasonably drawn from the evidence nevertheless must be construed in favor of the party opposing the motion, and all doubt must be | .¡resolved in favor of the opponent to summary judgment.
 
 Freeman v. Teague,
 
 37,932 (La.App. 2 Cir. 12/10/03), 862 So.2d 371.
 

 The City argues that the trial court did not err in granting its motion for summary judgment because the plaintiff failed to establish her prima facie claim against the City, as a common carrier. The plaintiff cannot prove that Mrs. Ricks was injured while riding a city bus or while attempting to disembark the city bus at the bus stop.
 

 A carrier has two levels of duty.
 
 Crear v. National Fire and Marine Insurance Company,
 
 469 So.2d 329 (La.App. 2 Cir.1985),
 
 writ denied,
 
 475 So.2d 364 (La.1985). It is well established that common carriers, such as buses or taxis, assume a high duty of care to their passengers.
 
 Id.
 
 
 *862
 
 While common carriers are not insurers of their passengers, they are required to exercise the highest degree of vigilance, care, and precaution for the safety of those whom they transport.
 
 Id.
 

 Once a passenger freely disembarks at his chosen destination free from harm, his status as a passenger, and the public carrier’s contract to transport for hire, ceases.
 
 Teer v. Continental Trailways,
 
 341 So.2d 1306 (La.App. 3 Cir.1977). At that point the public carrier only owes such person the duty of ordinary care. It is under no duty to warn the former passenger of “a danger which is apparent, obvious, and known to every person in good mind and sense, nor to personally transport, convey, or assist the former passenger in crossing a street or highway.”
 
 Id.
 

 In this case, Chuck Norman, who was employed at the Mazda Dealership across the street from the Piccadilly Cafeteria, testified that he ^witnessed Mrs. Ricks, along with two other females, exiting a Monroe City bus at the designated bus stop in front of the Mazda dealership. He stated that the three females began crossing Louisville Avenue after the bus had left the bus stop and that Mrs. Ricks was struck by a pickup truck while attempting to do so.
 

 The evidence clearly indicates that Mrs. Ricks safely departed from the city bus. Once she did so, she became a former passenger and the City only owed her a duty of ordinary care.
 

 Here, Mrs. Ricks was a 56-year-old woman who suffered from Huntington’s disease, which is an incurable neuro-degenerative genetic disorder. Common carriers can owe a greater duty to disabled passengers.
 
 Crear, swpra.
 
 However, a common carrier’s duty to assist a disabled passenger is not determined solely by the fact of disability.
 
 Id.
 
 The disability must be one that has somehow been made known to the carrier, and must be one of sufficient seriousness to make assistance necessary under the circumstances presented. In the absence of any of any apparent necessity for personal assistance to passengers boarding or alighting, the carrier is not required to furnish it. 13 C.J.S. CARRIERS § 727 p. 1362. Furthermore, the employees of a carrier are not required to use diligence to discover the feeble condition of a passenger and his inability to help himself. 13 C.J.S. CARRIERS § 727, p. 1364.
 

 Even though Ricks suffered from this disease and high blood pressure, she was capable of doing things for herself prior to the accident. Since she frequently rode the Monroe City bus either to go downtown or to | fieat at the Piccadilly Cafeteria, Mrs. Ricks was fully cognizant of the obvious danger in crossing Louisville Avenue. Additionally, the record does not contain any evidence that Mrs. Ricks requested assistance on the day that the accident occurred or on any past occasion.
 

 Andrew Jackson, who was formerly employed by the City as a bus driver, expressed his concern to his supervisors for passengers exiting the bus on the south side of Louisville Avenue in front of the Mazda Dealership and crossing Louisville Avenue in order to go to the Twin City Shopping Center or Piccadilly Cafeteria. Many times, he would allow the passengers going to those places to remain on the bus and get off on his return trip on the north side of Louisville Avenue at the bus stop adjacent to them. Jackson was advised by his supervisor that he could not allow the passengers to remain on the bus and ride free on the return trip and instructed him to charge a fare for the return trip. Jackson did not comply with supervisor’s orders, and continued to allow
 
 *863
 
 the passengers to remain on the bus and get off on his return trip for no additional charge.
 

 Leon Williams, who was also formerly employed by the City, testified that he advised his supervisors many times on the dangers associated with passengers crossing Louisville Avenue from the designated bus stop in front of the Mazda Dealership. Williams also submitted his comments via suggestion box at the Monroe Transit Authority, but no one from management contacted him concerning his suggestion.
 

 Joseph Comerford, who is employed by the City as the general manager at Monroe Transit Authority, testified that the policies and ^procedures of the transit authority did not have any guidelines regarding the selection or relocation of bus stops. Even though Comerford admitted that he never evaluated the bus stops that were a part of the Monroe Transit Authority’s bus stop system, he stated that the bus stops are constantly evaluated by his two supervisors. Some safety factors evaluated in determining whether a bus stop is safe include the landing of the bus stop, whether the bus stop is wheelchair accessible, and the distance from an intersection. Comerford also testified that none of the bus operators expressed their concern over the bus stop in question at any of the safety meetings. He also denied ever receiving any comments from any of the bus drivers about this bus stop being unsafe.
 

 Even though there appears to be a factual dispute about whether the City knew the potential danger of a passenger disembarking and then crossing Louisville Avenue’s busy lanes of traffic, the fact remains that once the passenger disembarks, the City only has a duty of ordinary care. The City does not have the duty assist Mrs. Ricks or any other former passenger in crossing a street or highway.
 

 In the 2200 block of Louisville Avenue, there are two bus stops. One bus stop is located directly in front of the Piccadilly Cafeteria on the north side of Louisville, while the other bus stop is directly opposite of the Picadilly, in the middle of the block on the south side. We can be certain that when the bus stop was placed on the south side of Louisville, it was not intended to be used to cross busy Louisville Avenue. Rather, it was | intended to serve the businesses on the south side of Louisville, such as the Mazda dealership, as well as some apartment complexes.
 

 However, if a passenger decides to get to the Piccadilly by exiting the bus at the bus stop in the middle of the block on the south side, the passenger has three ways to reach the restaurant:
 

 1. The passenger can get off at the stop on the south side of the street, walk 300-400 feet to the corner, where there’s a street light to control traffic, cross the street, and then walk 300-400 feet back to the Picadilly;
 

 2. The passenger can ride to the end of the bus line, pay an extra fare, and then ride the bus back to the Pica-dilly, getting off at the bus stop immediately in front of the Piccadilly; or
 

 3. The passenger can get off at the bus stop opposite the Piccadilly and go directly across the street in the middle of the block.
 

 Even though crossing the street in the middle of the block is the easiest and shortest way to reach the restaurant it is not the safest. Comerford suggested that the passengers take the safest option by walking to the intersection and crossing at the light. He also testified that anyone who has a legitimate reason for remaining on the bus and getting off on the return trip, such as being disabled or elderly, can
 
 *864
 
 remain on the bus, free of charge, so that they can exit at the bus stop directly in front of the Piccadilly Cafeteria. Comer-ford stated that he did not have any knowledge of the bus drivers being “threatened” if they allowed the passengers to remain on the bus and get off on the return trip.
 

 In the 30 years that this bus stop has been in existence, the plaintiff was the first and only individual to assert that the bus stop at issue is unreasonably dangerous because of its location. We cannot agree. Rather, |nit is the unsafe actions of the passengers after they leave the bus stop that are unreasonably dangerous. It is clear that Mrs. Ricks’s conduct is the cause of her injury, not the placement of the bus stop.
 

 Based on the evidence presented, we find that the bus stop is not inherently dangerous and the City had no duty to change it. Therefore, the plaintiffs first and second assignments of error bear no merit.
 

 Comparative Fault
 

 The plaintiff argues that summary judgment is not the appropriate vehicle to determine the issue of comparative fault and that this issue must be submitted to a jury under proper instruction.
 

 In support of her assertion that Mrs. Ricks is not 100% at fault for her injuries, she notes that Mrs. Ricks was a 54-year-old woman with Huntington’s Disease. Since she had a physical impairment, crossing with a stop light would only reduce, not completely eliminate the hazard of crossing a busy, heavily traveled street.
 

 Ordinarily, the determination of whether negligence exists in a particular case is a question of fact.
 
 Freeman, supra.
 
 Therefore, cases involving a question of negligence ordinarily are not appropriate for summary judgment.
 
 Id.
 
 This principle extends to questions of comparative fault as well. However, where reasonable minds cannot differ, a question of comparative fault is a question of law that may be resolved by summary judgment.
 
 Id.
 

 After reviewing the facts and evidence presented, we find that Mrs. Ricks was fully at fault for her injuries. Mrs. Ricks’s decision to cross the [ ¡(¡middle of the busy street after she left the bus stop caused her to get hit by the truck. The location of the bus stop had nothing do with her decision. Since reasonable minds cannot differ on that conclusion, the trial court properly granted summary judgment to the City.
 

 Uninsured Motorist Coverage
 

 In the fourth and final assignment, the plaintiff argues that the Uninsured Motorist (UM) rejection form was invalid because Mr. Pumphrey, an employee of Monroe Transit System, was not authorized to execute an UM rejection. Thus, the policy provides UM coverage.
 

 As stated in
 
 Teer, supra.,
 
 once a passenger freely disembarks at his chosen destination free from harm, his status as a passenger, and the public carrier’s contract to transport for hire, cease. Here, Ricks had already exited the bus at the bus stop at issue, so she no longer was a passenger. She was hit while crossing the street in the middle of the block. Since Ricks no longer had a connection with the city bus, the insurance does not provide any coverage. This issue regarding UM coverage is moot.
 

 CONCLUSION
 

 For the reasons stated above, we affirm the trial court’s decision. Costs of this appeal are assessed against the appellant, Wanda Ricks.
 

 AFFIRMED.
 

 
 *865
 
 APPLICATION FOR REHEARING
 

 Before WILLIAMS, STEWART, GASKINS, CARAWAY and LOLLEY, JJ.
 

 Rehearing denied.
 

 LOLLEY, J., would grant rehearing.